UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

NORDIC BULK CARRIERS A/S

~~FILED~~
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

Plaintiff

Case No. 20 -cv- *448-BSM*

-against-

APR 23 2020

LALUMINA LLC

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

**VERIFIED COMPLAINT IN
ADMIRALTY**

Defendant.

This case assigned to District Judge *Miller*
and to Magistrate Judge *Harris*

Plaintiff, Nordic Bulk Carriers A/S ("Nordic" or "Plaintiff"), by its attorneys, Floyd
Zadkovich (US) LLP and local counsel Wright, Lindsey & Jennings LLP, for its Verified
Complaint in Admiralty against Defendant, LAlumina LLC ("LAlumina" or "Defendant"),
(collectively, the "Parties") upon information and belief, alleges as follows:

### JURISDICTION

1.      This is a cause of admiralty and maritime jurisdiction, 28 U.S.C. § 1333, and is an
admiralty and maritime claim with the meaning of Rule 9(h) of the Federal Rules of Civil
Procedure and Rule B of the Supplemental Rules of Admiralty or Maritime Claims.

2.      At all relevant times, Plaintiff was and still is a corporation or other business entity
organized and existing under the laws of a foreign country with an office and place of business
located in Hellerup, Denmark.

3.      Upon information and belief, at all relevant times, LAlumina was and continues to
be a corporation or other business entity organized and existing under the laws of Delaware with
an office and place of business in Louisiana.

1

## UNDERLYING EVENTS

4.      On or about December 6, 2019, Nordic (as owners) and LAlumina (as charterers) entered into a maritime contract for the carriage of 55,000 metric tons of bauxite in bulk (10% more or less in owners' option) from Kamsar, Guinea to Burnside, Louisiana aboard the MV MEDI YOKOHAMA (the "Vessel"). This type of maritime contract is commonly referred to as a charter party.  The concerned charter party's terms were confirmed by way of a fixture recap of December 9, 2019 (the "Charter Party"). See Charter Party as Exhibit A.

5.      Pursuant to the Charter Party, LAlumina was obligated to make payments for freight, demurrage and other charges to Nordic.

6.      The Charter Party provided for a daily demurrage rate of $12,500 or pro rata.

7.      The Vessel performed the voyage and transported the cargo from Guinea to Louisiana without incident. However, freight and demurrage were incurred during the voyage in the following amounts: (a) 51,205 metric tons of bauxite in bulk at $14.74 per metric ton (yielding total freight costs of $755,273.75); (b) 3.4534722 days of demurrage at the discharge port (yielding $43,168.40 in demurrage); for a total due of (c) $798,442.15; subtracting previously payed amounts (d) ($717,510.06); and subtracting (e) $7,204.86 for dispatch at Kamsar; resulting in an outstanding payment of (d) **$73,727.23** for demurrage and freight. See Demurrage and Freight Invoice at Exhibit B.

8.      The Charter Party obligates LAlumina to pay Nordic all outstanding demurrage and freight. It specifically states: "[n]inety Five Percent (95%) of freight to be payable on Bill of Lading quantity to Owner's account within 5 (FIVE) banking days after completion of loading and telegraphic advice that Bills of Lading have been signed and released and receipt of Owners' Freight invoice by telegraphic (transfer) wire. Balance together with demurrage/dispatch to be

2

settled within 30 days of completion of discharge provided Charterers received Owners laytime calculations." Exhibit A, ¶3 at 4.

9.      Pursuant to the Charter Party Owners sent an initial invoice for 95% of the freight. Charterers paid this 95% freight portion in full. Pursuant to the above, the remaining 5% of freight, together with demurrage was to be due and payable within 30 days of the completion of discharge.

10.     On January 13, 2020 discharge was completed.

11.     On March 3, 2020 Nordic sent its laytime calculations to Charterers with corrections sent on March 4, 2020.

12.     More than 30 days have passed since the Vessel completed discharging.

13.     More than 30 days have also passed since Owners provided Charterers with their laytime calculations.

14.     Due to the passing of 30 days since discharge, in addition to (at the very latest) the passing of 30 days since the issuance of laytime calculations to Charterers, the outstanding sums are now past due.

15.     Said failure to pay the full amount of outstanding demurrage and freight constitutes a breach of the plain language of the underlying Charter Party.

16.     Despite repeated demands, and accounting for prior payments thus far received, the principal amount of $73,727.23 remains due and owing to Nordic, with recoverable interest continuing to accrue thereon.

17.     Pursuant to the Charter Party, the merits of disputes arising thereunder are to be resolved by arbitration in London, conducted in accordance with English law. Nordic is thus entitled to recover attorney's fees and arbitration costs incurred in connection with the anticipated arbitration proceedings.

18.     Nordic expressly reserves all rights to arbitrate the merits of the underlying dispute in London and brings the instant action solely to obtain *quasi in rem* jurisdiction over LAlumina together with security for its underlying claims (inclusive of estimated interest, estimated attorneys' fees, and estimated arbitration costs).

## FIRST CAUSE OF ACTION
### (breach of maritime contract by LAlumina)

19.     Paragraphs 1 through 13 of this Complaint are repeated and realleged as if the same were set forth here at length.

20.     LAlumina breached its obligations under the Charter Party by failing to make timely payments of demurrage and freight.

21.     Nordic thereby sustained damages: (a) in the principal amount of, at least, $73,727.23; (b) plus estimated interest (compounded quarterly for the length of time likely to encompass completion of the arbitration proceedings); plus (c) estimated attorney's fees and arbitral costs estimated for a total of $30,000. (*This is a conservative estimate and Plaintiff reserves all of its rights to see increased security as may be needed in this proceeding. Likewise, Plaintiff reserves all rights to seek and recover the full quantum of its damages, fees, costs, interest and other expenses in arbitration in England.*)

22.     LAlumina's breach of its obligations under the Charter Party has thereby caused Nordic to suffer damages, as best as can now be estimated, in an amount equal to no less than **$103,727.23**.

## RULE B ATTACHMENT

23.     Paragraphs 1 through 13 of this Complaint are repeated and realleged as if the same were set forth here at length.

4

24.     As set forth above, pursuant to the Charter Party, the underlying merits of disputes are to be resolved by arbitration in London. Nordic expressly reserves all its rights to arbitrate the merits of the underlying dispute and brings this action solely to obtain *quasi in rem* jurisdiction over LAlumina, together with security for damages (inclusive of interests, costs and attorney's fees as aforesaid), pursuant to the provision of Supplemental Rule B of the Federal Rules of Civil Procedure ("Rule B").

25.     Upon information and belief, and after investigation (as is more fully described in the Declaration of Gordon S. Rather), LAlumina cannot be "found" within the District within the meaning of Rule B, but Nordic is informed that LAlumina has, or will shortly have, property subject to attachment within this District. See *Declaration of Gordon S. Rather*.

26.     Specifically, a business entity called Almatis, Inc. ("Almatis") which is, pursuant to information and belief, incorporated under the laws of Delaware and its principal place of business is understood to be located in Little Rock, Arkansas. Upon information and belief: (a) Almatis purchased LAlumina from Ormet Corporation in 2013; (b) during such time LAlumina was a subsidiary of Almatis and supplied Almatis with alumina; (c) LAlumina was sold to Arthur Metals LLC in in or about June 2019; (d) Almatis, however, continues to be LAlumina's largest customer; (e) such transactions give rise to debts owed to LAlumina or other tangible or intangible property being held by Almatis for the benefit of LAlumina. The grounds for such information and belief include news articles, which state that "Almatis Burnside [now known as LAlumina] …will continue to supply Almatis…with premium-grade alumina." See Exhibit C. Moreover, an article published on or about April 3, 2020 noted that "LAlumina's largest customer is also its former owner, Almatis." Exhibit D.

5

27.     The total amount presently sought to be attached pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims by Plaintiff against Defendant, inclusive of the principal in the amount of $73,727.23, plus estimated interest thereon, estimated costs and fees for arbitration, equals at least, **$103,727.23**.

**WHEREFORE**, Nordic Bulk Carriers A/S prays as follows:

1.     That process in due form of law according to the practice of this Court may be issued against LAlumina;

2.     That the Court, in accordance with the provisions of Rule B of the Supplemental Rules for Admiralty or Maritime Claims, direct the issuance of Process of Maritime Attachment and Garnishment attaching all assets within the District owned by LAlumina LLC or in which said entity has a direct beneficial interest, up to the amount of **$103,727.23** so as to establish *quasi in rem* jurisdiction over LAlumina and to serve as security for subsequent enforcement of any arbitral awards and/or resulting judgments; and

3.     That the Court retain *quasi in rem* jurisdiction for the ultimate enforcement of any resulting arbitral awards and/or resulting judgments, and grant such other, further and different relief as may be just, proper and equitable.

Dated: April 23, 2020
Little Rock, Arkansas

By: _____

Gordon S. Rather, Jr. (68054)

Wright, Lindsey & Jennings LLP
200 West Capitol Ave, Suite 2300
Little Rock, Arkansas 72201
Email: grather@wlj.com
Phone: (501) 371 0808
Fax: (501) 376 9442
*Local Counsel for Nordic Bulk Carriers A/S*

6

Edward W. Floyd
Luke F. Zadkovich
Eva-Maria Mayer
Floyd Zadkovich (US) LLP
215 Park Ave South, 11th Floor
New York, New York 10003
Email: ed.floyd@floydzad.com
Phone: (917) 999 6914
Email: luke.zadkovich@floydzad.com
Phone: (917) 868 1245
Email: eva.mayer@floydzad.com
Phone: (617) 943 7957

*Attorneys for Nordic Bulk Carriers A/S
(Pro Hac Vice to be filed)*

## VERIFICATION

Gordon S. Rather, Jr. pursuant to the provisions of 28 U.S.C. § 1746, declares and states as follows:

1.      I am an attorney admitted to practice before this Court and am a partner with the firm of Wright, Lindsey & Jennings LLP, attorneys for Plaintiff, and I make this verification on behalf of Plaintiff.

2.      I have read the foregoing complaint and know the contents thereof, and the same are true to the best of my knowledge, information and belief. The sources of my information and the grounds for my belief are communications and information received from Plaintiff and its representatives, together with an examination of the papers relating to the matters in suit.

3.      The reason this verification is made by the undersigned, and not made by the Plaintiff, is that Plaintiff is a non-Arkansas business entity as to which I am informed that no officer or director is presently within this District.

4.      Plaintiff has not made any prior attachment application with respect to the matters in suit.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 23, 2020

[]

By: _____

Gordon S. Rather, Jr.

8

## DECLARATION

Gordon S. Rather, Jr. pursuant to the provisions of 28 U.S.C. section § 1746, declares and states as follows:

1.     I am an attorney admitted to practice before this Court and am a partner with the firm of Wright, Lindsey & Jennings LLP, attorneys for Plaintiff, and I am familiar with the facts of this matter.

2.     To the best of my information and belief, the above-named Defendant cannot be found within this District within the meaning of Supplemental Rule B for Admiralty or Maritime Claims.

3.     I caused a search to be made by going to the Louisiana Secretary of State website (https://www.sos.la.gov/Pages/default.aspx) and searching the Commercial Division for the Defendant – LAlumina LLC. This database contained record of the Defendant, showing it to be a Delaware entity and upon information and belief LAlumina's principal place of business is Louisiana. See Exhibit A.

4.     Further, although the information currently displayed on the aforementioned website notes that LAlumina's mailing address and principal business office is "Almatis Inc., 4701 Alcoa Road, Benton, AR 72015", upon information and belief, LAlumina was sold to Arthur Metals in LLC in our about June 2019 suggesting that such information is a mere holdover from the previous owners. See Exhibit B.

5.     Due to, upon information and belief, LAlumina being incorporated in Delaware with a principal place of business in Louisiana, LAlumina cannot be subject to general personal jurisdiction within Arkansas.

9

6.      Also, and very importantly, I caused a search to be made by going to the Arkansas Secretary of State website (https://www.sos.arkansas.gov/corps/search_all.php?fullsite) and searching the Corporation and Business Entity Database for the Defendant – LAlumina LLC. This database contained no record of the Defendant having authority to do business in Arkansas. I also searched additional, online directories for Arkansas in addition to running generic search engine (Google.com) searches and found no listings of Defendant in this District. Therefore, I think that any reference to LAlumina LLC having a presence in this state must be erroneous.

7.      For the foregoing reasons, it is my informed belief that the Defendant cannot be served with process within the District and that the Defendant cannot be "found" within this District within the meaning of Supplemental Rule B.

8.      I therefore respectfully request, on behalf of the Plaintiff, that the Court issue an order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment with respect to the Defendant's property within the District.

Dated:  April 23, 2020

By: _____

Gordon S. Rather, Jr.

10

**EXHIBIT A**

**State of**
**Louisiana**
**Secretary of**
**State**



**COMMERCIAL DIVISION**
**225.925.4704**

Fax Numbers
225.932.5317 (Admin. Services)
225.932.5314 (Corporations)
225.932.5318 (UCC)

| Name | Type | City | Status |
|------|------|------|--------|
| LALUMINA LLC | Limited Liability Company (Non-Louisiana) | WILMINGTON | Active |

**Previous Names**

ALMATIS BURNSIDE, LLC (Changed: 7/9/2019)

ALMATIS BURNSIDE, INC. (Changed: 8/8/2016)

**Business:**               LALUMINA LLC

**Charter Number:**         41369802Q

**Registration Date:**      12/16/2013

**Domicile Address**

251 LITTLE FALLS DRIVE

WILMINGTON, DE 19808

**Mailing Address**

ALMATIS INC.

4701 ALCOA ROAD

BENTON, AR 72015

**Principal Business Office**

ALMATIS INC.

4701 ALCOA ROAD

BENTON, AR 72015

**Registered Office in Louisiana**

501 LOUISIANA AVENUE

BATON ROUGE, LA 70802

**Principal Business Establishment in Louisiana**

41237 HWY 22

SORRENTO, LA 70778

## Status

| | |
|--|--|
| **Status:** | **Active** |
| **Annual Report Status:** | **In Good Standing** |
| **Qualified:** | 12/16/2013 |
| **Last Report Filed:** | 11/27/2019 |
| **Type:** | Limited Liability Company (Non-Louisiana) |

## Registered Agent(s)

| | |
|--|--|
| **Agent:** | CORPORATION SERVICE COMPANY |
| **Address 1:** | 501 LOUISIANA AVENUE |
| **City, State, Zip:** | BATON ROUGE, LA 70802 |
| **Appointment Date:** | 11/27/2019 |

## Officer(s)

**Additional Officers: No**

| Officer: | EMRE TIMURKAN |
|---|---|
| Title: | Manager |
| Address 1: | ALMATIS INC. |
| Address 2: | 4701 ALCOA ROAD |
| City, State, Zip: | BENTON, AR 72015 |

| Officer: | ALMATIS INC. |
|---|---|
| Title: | Member |
| Address 1: | ALMATIS INC. |
| Address 2: | 4701 ALCOA ROAD |
| City, State, Zip: | BENTON, AR 72015 |

## Amendments on File (4)

| Description | Date |
|---|---|
| Stmt of Chg or Chg Prin Bus Off | 12/28/2015 |
| Conversion | 8/8/2016 |
| Name Change | 8/8/2016 |
| Name Change | 7/9/2019 |

**Print**

**EXHIBIT B**



Home / News / Bauxite and alumina: Almatis sells shares in US Burnside subsidiary

# Bauxite and alumina: Almatis sells shares in US Burnside subsidiary

Posted 15th July 2019 in Industry news.



On 27 June, Almatis reported the sale of 100% of its shares in Almatis Burnside to Arthur Metals. Almatis Burnside is an alumina manufacturer based in Louisiana, USA and will continue to supply Almatis, along with other customers, with premium-grade alumina. Almatis expects little change over the coming months in the relations of the two companies. As well as supply to Almatis, the Burnside refinery supplies products directly to the specialty alumina and, sometimes, hydrate markets. The company is expected to change its name in due course following the acquisition.

## Roskill View

Almatis is a major producer of alumina products for use in the key markets of refractories, ceramics and polishing. It originally acquired the Burnside refinery facilities from Ormet Corporation in December 2013. At the time, the acquisition was seen as an important backwards integration for Almatis, providing the company with feedstock for its downstream alumina products manufacturing business. The Burnside refinery had 500ktpy of capacity at the time of this acquisition. Falling prices for bauxite and alumina through 2019, however, have made purchases of raw material from the market more attractive than having a captive supply.

The 10th edition of Roskill's Non-metallurgical Bauxite & Alumina: Outlook to 2029 report, with detailed analysis of the market, will be published in August 2019. Click here to download the brochure and sample pages or to access further information.



## RELATED PRODUCTS

Metallurgical Bauxite & Alumina

## ROSKILL

**Head office**
54 Russell Road, Wimbledon, London, SW19 1QL, United Kingdom

**Regional offices**
Canada, China, Brazil, Germany, Japan, New Zealand, Slovakia, South Africa, Spain

+44 20 8417 0087
Contact Us

.cls- .cls-
1{fill:#333}i#363}icon-
twitterlinkedin

## ABOUT US

Contact

About

The Team

The Board

Careers

Consulting

Costs & Data Services

News

Subscribe to our Weekly Round-up

## MARKET REPORTS

Steel Alloys

EV Raw Materials

Copper & Technology Metals

Industrial Minerals & Chemicals

All Market Reports

## EVENTS

Technology Metals 2021

On the road… Santiago 2021

Salt 2020

On the Road… London 2020

All events

Terms of Use

Privacy Notice

Event Terms & Conditions

Subscription Terms

Copyright Notice

Website by designbooth

## DECLARATION IN SUPPORT OF AN ORDER APPOINTING
## A PERSON TO SERVE PROCESS

Gordon S. Rather, Jr., pursuant to the provisions of 28 U.S.C. § 1746, declares and states as follows:

1.    I am an attorney admitted to practice before this Court and am a partner with the firm of Wright, Lindsey & Jennings LLP, attorneys for Plaintiff.

2.    I make this Declaration in support of Plaintiff's application, pursuant to the provision of Rule 4(c) of the Federal Rules of Civil Procedure and the provision of Rule B(1)(d)(ii) of the Supplemental Rules for Admiralty or Maritime Claims, for an Order appointing Gordon S. Rather, Jr. or any other person instructed by Gordon S. Rather, Jr., in addition to the United States Marshal, to serve Process of Maritime Attachment and Garnishment on the garnishee listed in the Process, together with other possible garnishees.

3.    The persons who would be instructed by Gordon S. Rather, Jr. to serve such process are over 18 years of age and are not parties to this action.

4.    Plaintiff desires to service Process of Maritime Attachment and Garnishment on the garnishee promptly so that Plaintiff will be fully protected against the possibility of not being able to satisfy any arbitral award against Defendant (or any subsequent judgment[s] confirming such award[s]).

5.    Plaintiff respectfully request, for the foregoing reasons, that the Court appoint Gordon S. Rather, Jr. or other persons instructed by Gordon S. Rather, Jr. to serve the Process of Maritime Attachment and Garnishment upon the garnishee listed in the Process, together with any other garnishees that Plaintiff learns may hold assets of Defendant.

11

Dated: April 23, 2020

By: _____

Gordon S. Rather, Jr.

**EXHIBIT A**

## CHARTER PARTY

## BAUXITE – PORT KAMSAR/BURNSIDE

New York

This Charter Party made and entered into on the 6th day of December, 2019, by and between LALUMINA LLC, Highway 22, Burnside LA, 70738, (herein referred to as "Charterer") and NORDIC BULK CARRIERS A/S, Tuborg Havnevej 4-8, 2900-Hellerup, Denmark, as Owners, (herein referred to as "Owner"), as follows:

      1.      It is this day mutually agreed that: the Charterer undertakes to ship cargo and the Owner undertakes to provide tonnage to carry same as follows:

BAUXITE IN BULK - as full/sole cargoes - no other cargo to be carried.

For one cargo of Bauxite in Bulk Group C, always loaded in accordance with the IMSBC Code and International regulations each cargo.

Laycan:                December 13-19, 2019

Quantity:           55,000 Metric Tons, 10% more or less in Owners' option

Vessel nomination as per terms/regulations attached in Annex I.

~~Charterers to give Owners 30 days' notice of required layday commencement with stem in order for a 10 days spread, inclusive. Within 5 days, Owner to indicate a named vessels or suitable substitute and thereafter, as to reach Charterers not later than 15 days prior to 1st day of laycan. Owners to name actual performing vessel with expected intake (but always with the agreed minimum/maximum quantity), latest 5 days prior to vessel's ETA load port. Performing vessels and any subsequent substitution to be subject Shippers/Receivers approval within 24 hours, Saturdays, Sundays and holidays excepted after receipt of complete nomination.~~

Owners are responsible to:

- meet prevailing restrictions at both ends,
- arrive, load/discharge, and sail basis prevailing drafts and to get under and stay under loading/discharging equipment throughout operations.

MV NORDIC TBN (fgos mv medi yokohama has been accepted)
SDBC
Geared or gearless in owners' option
Max 15 years

**RIDER CLAUSES TO MV "NORDIC TBN"**
**CHARTER PARTY DATED** DECEMBER 6TH, 2019
**BETWEEN** NORDIC BULK CARRIERS A/S **AND** LALUMINA LLC

~~Owners to nominate intended performer latest 15 days prior 1st day of laycan and final performer latest 7 days before vessels ETA load port and always within laycan. Performing vessels and any subsequent substitution to be subject to charterers/shippers/receivers approval within 24 hours Saturdays, Sundays and holidays excepted after receiving same within office hours in New York USA, 0900-1700 Saturdays, Sundays and holidays excepted.~~

With nomination Owners are to provide the following:

- Full/ complete vessel description, including hatch cover type and dims
- Vessel's head-owners and full ownership chain
- Last 3 cargoes
- IMO number
- Present position and expected full itinerary, including ETA load and discharge port(s)
- Vessel's declared cargo intake basis intended discharge port and intended stow plan
- Expected sailing draft from loading port and arrival draft at discharge port
- Copies of valid ISPS/ Class/ P&I/ ISM certificates by email attachment
- Vessels P&I Club/Class

Vessel/owners to comply with terminal/shippers vetting rules and requirements both ends and to be part of charter party and overrule it.

~~Confirm 1.2 loading rate - no change without mutual discussion on impact on freight rate/demurrage calculation.~~

Nomination of vessel:

Vessel nomination shall include as details as per Clause one and provide IMO number, ownership chain (if any, through to head owner), estimated intake ~~on 38' fresh water Trombetas~~ and ETA loading port and include copies of DOC, SMC and ISSC.

Each nomination of performing vessel and any subsequent substitute vessel to be subject to Shippers/Charterers/ Receivers' approval as per terms/conditions attached ~~within 24 hours, Saturday, Sunday and Holiday excepted of receipt by Charterers of Owners nomination, within office hours in New York USA, 0900-1700 satshex~~.

Vessel owners confirm performing vessel to be/have:

- Geared or gearless in Owners' option
- Single deck, bulk carrier, self-trimming, class highest Lloyds or equivalent by a member of the international association of classification societies (IACS)
- Performing vessel to be suitable in all respects for all load and discharge facilities including but not limited to LOA/Beam/Draft/Gear and the voyage described in this charter party and for the carriage of bauxite in bulk
- In conformity with attached Kamsar loading port vessel requirements
- No twin hatches
- No centerline beam or bulkhead, no fitting, no wood or obstructions in holds
- Vessel to perform this voyage at min 11.00 knots weather permitting
- Vessel to have full P and I coverage for duration of this voyage - Owners to advise with vessel nomination
- Vessel age max 15 years at completion of loading

2

**RIDER CLAUSES TO MV "NORDIC TBN"**
**CHARTER PARTY DATED DECEMBER 6TH, 2019**
**BETWEEN NORDIC BULK CARRIERS A/S AND LALUMINA LLC**

− Owners confirm that performing vessel\s will be ISSC certified and carry a valid original certification onboard the vessel for the duration of this voyage and owners to supply copy of same if requested by charterers or their agents
− Vessel/Owners responsibility to get under any bridges to reach Burnside Terminal, Burnside, Louisiana

Suitable in all respects for:

    A. The load and discharge berths and ports
    B. Carriage of Bauxite in Bulk
    − Performing vessel(s) to be fully P & I Club covered.
    − Performing vessel must be free of any obstructions/fittings in cargo spaces/holds/hatch ways/tank tops.
    − Performing vessel(s) to comply with all Government regulations applicable to vessels engaged in such transport.

~~If applicable, Owners confirm that Performing Vessel will be "Brazilian" approved (D.P.C .inspection).~~

Owners confirm that they are familiar with this trade.

It is understood that Owners are responsible to meet prevailing restrictions at both ends, including draft/restrictions at loading/ discharging ports. ~~as well as Brazilian requirements as applicable.~~

Scheduling and Performance:

Owners are required to only nominate vessels suitable as per Charter Party requirements and to endeavor to nominate most economical intake in the event of reduced draft at load port, with an itinerary at the time of nomination that can effectively perform the lifting within the required dates as declared by the Charterers. The inability of a given nominated and accepted performing vessel to perform under this contract shall not relieve Owners of its obligation hereunder.

In the event any dedicated vessel is unable to perform under this contract, Owners shall utilize an alternate vessel from their fleet or to secure 3rd party vessel to meet the declared laycan.

Performing vessel always to be in conformity with United States Law, including restrictions imposed by the US Treasury Department Office of Foreign Assets Control (OFAC) and the US Commerce Department, Bureau of Industry and Security (BIS) and United Nations Proclamations prohibiting certain flag/ownership/management from participating in trade covered by this charter. Owners responsible for all costs/consequences if in violation of this warranty.

Performing Vessel(s) always to be in conformity with United States/United Nations law/directives/proclamations prohibiting certain flags/ownership/management from participating in trade covered by this charter. Owners responsible for all costs/consequences if in violation of this warranty.

    **2.** That the said nominated ship, being warranted tight, staunch and strong, and in every way fitted for the voyage, shall, with all convenient speed, proceed to Porto Kamsar, Guinea, always afloat, to load her cargo of BAUXITE IN BULK, loading maximum possible on prevailing draft, (final quantity at Master's discretion, but understood to be within tolerance per Clause 1), there loading in the customary manner, in regular turn, when, where and as soon as ordered by Shippers' Agents, not exceeding what

3

**RIDER CLAUSES TO MV "NORDIC TBN"**
**CHARTER PARTY DATED** DECEMBER 6TH, 2019
**BETWEEN** NORDIC BULK CARRIERS A/S **AND** LALUMINA LLC

she can reasonably stow and carry over and above her Tackle, Apparel, speed, proceed to, always afloat, one – two safe berth(s) BURNSIDE TERMINAL, BURNSIDE, LOUISIANA, USA, or in Charterers' option ARTCO Buoys 110 or 121, attached Impala Terminal Burnside Rules and Regulation to apply in full, and there deliver the cargo as customary, when, where, and as directed by consignee, to whom written notice is to be given of the ship's being ready to discharge.

If Charterers require 2nd berth at load or discharge, same to be for Charterers' account.

Understood Owners responsibility to arrive, berth, load and sail at load port and arrive berth discharge at discharge port, sail on prevailing drafts including tides.

Owners to comply with load port Kamsar Port requirements and Impala Burnside vetting rules and discharge requirements.

Terms and conditions of both Kamsar Port loading terms and conditions and vessel requirements, and Burnside terminal rules and regulations as attached.

(See Clauses 12 and 29.)

Latest by 20 days prior to 1st day of laycan Charterers' option to declare a different discharge port within Atlantic Ocean/Med/Black, freight to be calculated on open book basis. If disport East of Passero then time charter equivalent to be calculated repositioning the vessel in Cape Passero.

### 3.    **Freight Rate:**

U.S.$14.75 (fourteen dollars and 75/100) per Metric Ton F.I.O. Spout/Grab Trimmed basis prevailing draft at both load/discharge port, no draft guarantee by Charterers, no draft escalation, basis Burnside.

U.S.$xx.x (xx) per Metric Ton F.I.O. Spout/Grab Trimmed basis prevailing draft at both load/discharge port, no draft guarantee by Charterers, no draft escalation, basis Artco Buoys 110/121.

Freight in U.S. Currency based on Bill of Lading quantity, in full of all port charges, pilotages, consulages, light dues, lighterage, tug charges and all other dues usually paid by Owners. Hospital fees, lighthouse, buoy and other normal port charges to be for ship's account. Freight Tax, if applicable, to be for Owners' account. Taxes, dues if any, on cargo to be for Charterers' account. Taxes, dues if any, on vessel and or freight to be for Owners' account. All other taxes on cargo, if any, including Port Utilization Tax in BRAZIL (if loading Brazil), to be for Charterers' account.

Any additional leveling and trimming at loading required by Master over and above vessel safe sailing trim to be for Owners' account.
Charterers to always leave vessel in safe sailing trim to Masters satisfaction.

Ninety Five Percent (95%) of freight to be payable on Bill of Lading quantity to Owner's account within 5 (FIVE) banking days after completion of loading and telegraphic advice that Bills of Lading have been signed and released and receipt of Owners' Freight invoice by telegraphic (transfer) wire.

Charterer has the privilege to deduct commissions from freight. Balance together with demurrage/despatch to be settled within 30 days of completion of discharge provided Charterers received Owners laytime calculations.

**RIDER CLAUSES TO MV "NORDIC TBN"**
**CHARTER PARTY DATED** DECEMBER 6TH, 2019
**BETWEEN** NORDIC BULK CARRIERS A/S **AND** LALUMINA LLC

Full freight deemed earned as cargo loaded on board discountless and non-returnable, ship and/or cargo lost or not lost.

Following to be inserted in all Bill(s) of Lading issued pursuant to this Charter Party:

"FREIGHT PAYABLE AS PER GOVERNING CHARTER PARTY"

Owners Bank as follows: To be advised

**4.** Owner to make its own arrangements for payment of disbursements/ship's expenses at ports of loading/discharging.

**5.** The cargo to be loaded at the average rate of 24,000 Metric Tons per weather working day (of 24 consecutive hours) Sundays and Holidays included and to be discharged at the average rate of 13,000 Metric Tons per weather working day (of 24 consecutive hours) Sundays and Holidays included, except at load port: New Years Day, Carnival, and Christmas day, and except at discharge port: New Years Day, Mardi Gras Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day; which are not to count, unless used, in which case actual time used to count; time lost by reason of all or any of the following causes shall not be computed in loading or discharging time, viz: War, Rebellion Tumults, Civil Commotions, Insurrections, Political Disturbances, Epidemics, Quarantine, Riots, Strikes, Lockouts, Stoppage of Miners, Workmen, Lightermen, Tugboatmen, or other hands essential to the working carriage, delivery, shipment or discharge of the said cargo, whether partial or general, or accidents at the mines, at Receivers' Works or Wharf, land-slips, floods, snow, bad weather, intervention of Sanitary Customs and/or other constituted authorities, partial or total stoppage on Rivers, Canals or on Railways or any other cause beyond the control of the Charterer or their servants.

Otherwise as per Kamsar & Impala Burnside terms and regulations which integral part of the Charter Party.

**6.** Laytime shall commence at loading port twelve (12) hours and at discharging port twelve (12) hours after tendering Notice of Readiness, whether in port or not, whether in berth or not, and after being in Free Pratique and entered at Customs, unless load/discharge commences earlier, in which case actual time used to count.

If berth is occupied, vessel must tender Notice of Readiness from closest safe anchorage available, whether in port or not, whether in berth or not, whether in Free Pratique or not, whether in Customs Clearance or not, and shifting time not to count as laytime or time
on demurrage.  (See Clause 29)

It is understood that Notice of Readiness may be tendered at load and discharge ports any time (24 hours), Sundays and Holidays included, except that Vessel is not to tender on, nor is time to count on, the "Super" Holidays (as outlined in Clause 5), unless used, in which case actual time used to count.

Local port/state holidays/holidays as per BIMCO calendar not to count as laytime nor demurrage.

Laytime shall cease at loading port upon completion of loading provided vessels sailing is not delayed, and at discharging port upon completion of discharge after Charterer's holds have been shovel cleaned by Charterer.

**RIDER CLAUSES TO MV "NORDIC TBN"**
**CHARTER PARTY DATED** DECEMBER 6TH, 2019
**BETWEEN** NORDIC BULK CARRIERS A/S **AND** LALUMINA LLC

Opening and closing of hatches at loading and discharging ports to be for account of ship and time so lost not to count as laytime, (always provided local labor regulations permit, otherwise same to be for Charterer's account).
The Captain shall cover the hatch of each hold as soon as loading into same has finished and also all hatches when the loading or discharging has finished for the day, if the weather be wet or threatening upon request of Shippers and Receivers, he shall also, during rain and snow, cover up all hatches in which loading or discharging is not actually going on. (It is understood that opening/closing hatches to be for Owner's account provided local regulations allow the crew to perform same.)

    **7.**    The ship to be loaded and discharged with shore equipment. Charterer's stevedores to serve at both load and discharge ports. Owner to have holds cleaned and ready in all respects for loading this cargo prior to tendering Notice of Readiness. However, in case of a dispute as to vessel's cleanliness, Owner and Charterer agree that an independent Lloyd's Surveyor's ruling to be binding.
Vessels holds to be left customarily shovel clean at discharge port and laytime used to count

Vessel to be discharged by mechanical grabs. Stevedore damages, if any, shall be settled between stevedores and ship prior to ships' departure from discharge port and Charterer shall cooperate fully with ship's Master to expedite settlement, provided Master notifies Charterer in writing in a timely manner. Charterer will not consider any claim for stevedore damage unless given notice in writing at time of occurrence, unless for hidden damages, but Charterers to remain ultimately responsible.

    **8.**    Overtime shall be for account of party ordering same; if ordered by the Port Controller or any other authority, same to be for Charterer's account, but officer's and crew's overtime always to be for Owner's account.

    **9.**    Demurrage: If loading/discharging is not completed within the allotted laytime, Seller shall pay demurrage at the rate to be declared by owners with vessel nomination and always in-line with market but max USD 12,500 per day or pro rata,  half despatch for laytime saved both ends. in excess of the said allotted laytime on the total shipment tonnage. Buyer shall pay dispatch at half the demurrage rate for all laytime saved.

    **10.**    Laytime Non-Reversible.

    **11.**    Burnside Terminal Rules and Regulation to apply.

    **12.**    Owners to nominate charterers' agents both ends, owners paying customary fees both ends, including but not limited to high water fees, ISPS charges and agency fees related to same.

Load Port Agents:    to be advised

Discharge Port Agents: to be advised

    **13.**    General Averages occurring under this charter to be settled in London according to York-Antwerp Rules 1974 as amended 1990 and any subsequent recognized amendments,  and as to matters not provided for by these rules, according to the laws and usages at the Port of London.

    **14.**    Master to advise Charterer as well as Charterer's Agents at port of loading, should he have to put in at any port or ports.

6

**RIDER CLAUSES TO MV "NORDIC TBN"**
**CHARTER PARTY DATED** DECEMBER 6^(TH), 2019
**BETWEEN** NORDIC BULK CARRIERS A/S **AND** LALUMINA LLC

**15.**     In case of Jettison, the Captain to report same to Consignees immediately.

**16.**     A brokerage commission of 1.25% on the gross amount of freight, deadfreight and demurrage is due to IFCHOR NORTH AMERICA payable by owners.

**17.**     Owners/Master to give/cable/loading port Agents and IFCHOR NORTH AMERICA (email: operations-north.america@ifchor.com), giving 10, 7 and 5 days, 96, 48, 24 and 12 hours notice of ETA load port.
Immediately upon sailing from load port, Owners/Master to give/cable IFCHOR NORTH AMERICA (email: operations-north.america@ifchor.com), giving quantity loaded in metric tons, stowage by holds, and ETA discharge port.
Owners/Master to give/cable discharge port Agents and IFCHOR NORTH AMERICA (email: operations-north.america@ifchor.com), giving 7 and 5 days, 72, 48, and 24 hours notice of vessel's ETA Burnside.

**18.     FORCE MAJEURE**

A.     Neither the vessel, the Master, Carrier nor Charterer shall, unless otherwise in this contract expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder, arising or resulting from a declaration of Force Majeure from Suppliers MRN/HYDRO, government intervention, act of God, act of war, insurrection, riot, embargo, perils of the sea, fire, explosions, earthquake, storm, tidal wave or similar disturbance, flood, drought, act of public enemies, pirates or assailing thieves, arrest or restraint of princes, rulers or people or seizure under legal process provided bond is promptly furnished to release the vessel or cargo; breakdown of machinery or facilities on board vessel; breakdown of shore machinery or facility including shore loading and discharging equipment for more than three (3) days; strike, lockout, combination of workmen, stoppage or restraint of labor from whatever cause, either partial or general; law, act, order, proclamation, decree, regulation, ordinance, instruction or request of government or other public authorities, federal, state, local or foreign; judgment or decree of a court of competent jurisdiction; delay or failure of usual carriers or contractors, or suppliers of Bulk Bauxite, at any time or business curtailment, labor shortage or inability to obtain Bulk Bauxite, operating materials, plant equipment; any contingency or delay or failure or cause of any nature beyond the control of Charterer or of Carrier, (any such contingency, delay or failure being hereinafter called "Force Majeure"), preventing or hindering Charterer from shipping or Carrier from transporting the Bulk Bauxite referred to herein. Prompt written notice to the other party shall be given by the party affected by such Force Majeure. Any party invoking Force Majeure pursuant to this Clause, shall, upon termination of such Force Majeure, give prompt notice thereof to the other party.

B.     Carrier shall not be required to order a nominated vessel to proceed to a designated loading port on any voyage if at the time the vessel would arrive at such port either the port or ports of loading or the port or ports of discharging are subject to a

C.     Laytime shall be suspended and demurrage shall not accrue during any delays in loading or discharging due to Force Majeure as defined above.

**19.**     Charterer shall remain responsible for freight, deadfreight and demurrage incurred at ports of loading and discharging.

**20.**     Should any dispute arise between Owner and Charterer, the matter in dispute shall be referred to three persons in London, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing

any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men conversant with shipping matters.

Notwithstanding anything contained herein to the contrary, should the sum claimed by each party not exceed U.S. $50,000.00 - LUMPSUM, (exclusive of interest on the sum claimed, costs of the arbitration and legal expenses, if any), the dispute is to be governed by English Law

21.     If the vessel calls at any U.S. port for the purpose of loading or discharging cargo, vessel's cargo gear and all other equipment shall comply with regulations established by U.S. Public Law 85-742, Part 9 (Safety and Health Regulations for Longshoring), or similar and/or currently applicable requirements in the countries involved. If Longshoremen are not permitted to work due to failure of the Master and/or Owners' Agents to comply with the aforementioned regulations, any delay resulting therefrom shall be for Owners' account.

22.     U.S.A. Clause Paramount, New Jason Clause, New Both-to-Blame Collision Clause, P & I Bunkering Clause, and BIMCO Standard War Risks Clause for Voyage Chartering, 2004 ( ode Name: "VOYWAR 2004"), BIMCO Standard ISM Clause and BIMCO Standard ISPS Clause are considered to be fully incorporated in this Charter Party.

23.     The Owner of the vessel(s) performing under this Charter has obtained and supplied their vessel(s) with a Certificate of Financial Responsibility (Oil Pollution) in compliance with the requirements of the United States Water Quality Improvement act of 1970, and/or current regulations, or similar and/or currently applicable requirements in the countries involved.

24.     Charterer' understands at least the following restrictions apply; this information is given as a guidance only and without guarantee:

~~TROMBETAS: 245 Meters LO.A.; about 36-38' feet fresh water draft depending upon time of year; distance from waterline to hatchcoaming of about 13.5 meters minimum (July) and about 19 meters maximum (December).~~

BURNSIDE TERMINAL: Prevailing Mississippi River draft. Owner familiar with trade.

25.     Any extra insurance on cargo on account of vessel's age over 15 years, flag, class or ownership to be for Owner's account and to be deducted from freight.

26.     Owner warrants that performing vessel(s) are suitable for customary grab discharge of bulk cargoes.

27.     Owner to have the right to bunker vessel enroute without significant delay from the voyage or delay in the arrival of the cargo.

28.     Owner confirms having checked and satisfied itself that its vessel is suitable for the loading facilities in Port Kamsar.

29.     If the loading berth is not available on vessel's arrival at or off the port of loading or so near thereunto as she may be permitted to approach, the vessel shall be entitled to give Notice of Readiness on arrival there with the effect that laytime counts as if she were in berth and in all respects

ready for loading provided that the Master warrants that she is, in fact, ready in all respects. Actual time occupied in moving from place of waiting to loading berth not to count as laytime or time on demurrage. If, after berthing ,the vessel is found not to be ready in all respects to load, the actual time lost from the discovery thereof until she is, in fact, ready to load shall not count as laytime. (It is understood that if the berth is free the vessel is obligated to proceed to berth before tendering.)

**30.**     Owner agrees to stow this cargo in minimum number of holds possible.
Subject to head owners'/master's approval and vessel's suitability.

**31.**     When so requested by Charterers or their representatives, Owners to shift vessel under the loading appliance or shift vessel at the discharging port as necessary to facilitate loading/discharging operations, at no extra cost. Same to be accomplished by crew by warping vessel within the same berth only, always providing local regulations/ customs permit, otherwise any such shifting to be for Charterers' account. Linehandlers from shore, if required, to be for Charterers' account. Laytime used for shifting to count.

**32.**     Any delays/boycotts due vessel's nationality or flag to be for Owner's account.

**33.**     This Agreement shall be governed by the general maritime law of the United Kingdom. In the event there is no recognized rule under the general maritime law as to any matters arising hereunder, English law shall apply.

**34.**     Owners to utilize Unique Bill of Lading Identifier and to apply suitable SCAC Code for all Bills of Lading issued for trading to U.S.A.

### 35.     **Freight Beneficiary of this Charter Party:**

If Freight Beneficiary is different than the Owners/Disponent Owners of the vessel, then "Written Declaration/ No Objection Letter" from Head Owners/Disponent Owners to be asked for Charterers paying the freight to the nominated "Freight Beneficiary" in accordance with 0 AC Clause which is as incorporated in the Charter Party.

### 36.     **Encumbrance Clause**

Owners guarantee the vessel is free from any obligation, encumbrance, claim or lien, of a financial nature or otherwise, that would interfere in any way with the vessel's performance  of this voyage and/or the delivery of the cargo with the utmost despatch. In the event the vessel cargo is liened or arrested during the currency of this Charter Party (or after completion of discharge in respect of the cargo) the owners are to take immediate action to release vessel/cargo from any such lien or arrest and to remain fully responsible for the cost or damages caused as a result of any lien or arrest or interruption of the vessel's performance under this Charter Party.

### 37.     **Ballast Water Management Clause**

Owners warrant that the vessel shall comply with all mandatory ballast water requirements. The Owners shall assume liability for and shall indemnify, defend and hold harmless the Charterers against any loss and/or damage (excluding consequential loss and/or damage) and any expenses, fines, penalties and any other claims, including but limited to legal costs, arising from the Owners' failure to comply with any such provisions.

**RIDER CLAUSES TO MV "NORDIC TBN"**
**CHARTER PARTY DATED DECEMBER 6ᵀᴴ, 2019**
**BETWEEN NORDIC BULK CARRIERS A/S AND LALUMINA LLC**

Should such failure result in any delay then, notwithstanding any provision in this Charter arty to the contrary, the period of such delay shall not count.

**38.    Bunker Fuel Sulphur Content Clause**

Owners confirm they are aware of the maximum sulphur content requirements of any emission control zone the Vessel may be required to enter during the performance of this Charter. Owners warrant that Owners and the Vessel shall comply with all applicable requirements of any emission control zone and shall use fuels (which term shall include all heavy fuel oils, marine gas oils and marine diesel oils as applicable) of such specifications and grades to ensure compliance with these requirements.

For the purpose of this Clause, "emission control zone" shall mean areas as stipulated in MARPOL Annex VI and/or zones and/or areas regulated by regional and/or national authorities such as, but not limited to, the EU, the US Environmental Protection Agency and the California Environmental Protection Agency. Owners shall indemnify, defend and hold Charterers harmless in respect of any direct loss, liability, delay, fines, costs or expenses arising or resulting from Owners' failure to comply with this Clause.

**39.** It is agreed and understood that this fixture is to be treated as strictly private a d confidential by all concerned.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.


**OWNER:**                                    **CHARTERER:**

10

**RIDER CLAUSES TO MV "NORDIC TBN"**
**CHARTER PARTY DATED** DECEMBER 6TH, 2019
**BETWEEN** NORDIC BULK CARRIERS A/S **AND** LALUMINA LLC

## BIMCO ISM CLAUSE for Voyage and Time Charter Parties

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both Vessel and "The Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "The Company" to comply with the ISM Code shall be for Owners' account.


## BIMCO ISPS/MTSA CLAUSE FOR VOYAGE CHARTER PARTIES 2005

(a)      (i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLA (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). if trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate)  and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense  or delay) caused by failure on the part of the Owners or "the Company" or "Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)      (i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA.

(ii) Loss, damages or expense (excluding consequential loss, damages or expense) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party, and any delay caused  by such failure shall count as laytime or time on demurrage.

(c)      Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code/MTSA, the following shall apply:

(i)   Notwithstanding anything to the contrary provided in this Charter Party, the Vessels  all be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed in a port facility or any relevant authority under the ISPS Code/MTSA.

(ii)  Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code/MTSA shall count as laytime or time on demurrage, unless such measure results solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.

11

**RIDER CLAUSES TO MV "NORDIC TBN"**
**CHARTER PARTY DATED** DECEMBER 6TH, 2019
**BETWEEN NORDIC BULK CARRIERS A/S AND** LALUMINA LLC

(d)      Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or  taxes and inspections, shall be for the Charterers' account, unless such costs or expenses results solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel the nationality of the crew or the identity of the Owners' managers. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(e)      If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

*Footnote: This Clause replaces previously published ISPS Clause for Voyage Charter Parties ANO the US Security Clause for Voyage Charter Parties, both of which are now officially withdrawn.*

## U.S. CUSTOMS ADVANCE NOTIFICATION / AMS CLAUSE

(a)    If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Owners shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of  such regulations and shall, in their own name, time and expense:

i)  Have in place a SCAC (Standard Carrier Alpha Code);
ii)  Have in place an ICB (International Carrier Bond);and
iii) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs.

(b)    The Charterers shall provide all necessary information to the Owners and/or their agent  to enable the Owners to submit a timely and accurate cargo declaration.
The Charterers shall assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers failure to comply with any of the provisions of this sub-clause. Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall count as laytime or if the Vessel is already on demurrage, time on demurrage.

(c)    The Owners shall assume liability for and shall indemnify, defend and hold harmless the Charterers against any loss and/or damage whatsoever (including consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Owners failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall not count as laytime or if the Vessel is already on demurrage, time on demurrage.

(d)    The assumption of the role of carrier by the Owners pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity carrier under any bill of lading, other contract, law or regulation.

**RIDER CLAUSES TO MV "NORDIC TBN"**
**CHARTER PARTY DATED DECEMBER 6TH, 2019**
**BETWEEN NORDIC BULK CARRIERS A/S AND LALUMINA LLC**

# ANNEXES A & B

## LOAD AND DISCHARGE PORT TERMS AND REGULATIONS

**ANNEX I TO MV "NORDIC TBN"**
**CHARTER PARTY DATED DECEMBER 6TH, 2019**
**BETWEEN NORDIC BULK CARRIERS A/S AND LALUMINA LLC**

---

**Annex C**
**LOADING REGULATIONS – REVISION EFFECTIVE JANUARY 2017**

**PORT OF KAMSAR**

NOTE: The Loading Regulations may be revised from time to time.

**A.  GENERAL PROVISIONS**

1.   As used herein, **"CBG"** shall mean *Compagnie des Bauxites de Guinée*, **"Buyer"** shall mean the purchaser of CBG bauxite and **"Seller"** shall mean the seller of CBG bauxite. All volumes described in these loading regulations are based on 3% moisture.

2.   Deliveries shall be made, loaded and trimmed by CBG's telescopic chute to the Vessel Master's satisfaction free on board bulk carriers provided by the Buyer, which ships shall be suitable to berth and load at CBG's loading facilities at Port Kamsar, Guinea, and shall have characteristics suitable for loading and trimming of bulk cargoes, and shall be classed 100A1 with Lloyds Register of Shipping or equivalent class established by another recognized classification society. All ships are to provide an ISPS certificate and an IMO number on arrival at Kamsar prior to loading.

3.   The term **"bulk carrier"** shall mean a single deck vessel into which cargo can be loaded by CBG's loading facility without the necessity of hand trimming.

4.   The draft at the berth and depth of water in the channel approaches and swinging basin shall be determined by the port works as constructed by the responsible authorities of the government of Guinea.

5.   Vessels may be rejected for loading if the vertical distance from the waterline to the top of the highest hatch coaming exceeds 50 feet at any time while alongside the loading berth.

6.   The vessel quantity shall not be less than 43,000 metric tons.

**B. SCHEDULING**

7.  The vessel loading dates shall be deemed to allow for a total of twelve (12) laydays, five (5) of which shall precede the specified loading date and six (6) of which shall follow the specified loading date.

8.  CBG shall have the right, by twenty-five (25) days notice in the case where inventories are below 300,000mt, to defer any vessel loading date or estimated vessel loading date where appropriate to alleviate congestion at the port; provided, CBG shall have no right to defer the loading date of any vessel nominated within twenty-five (25) days of its loading date in accordance with these Loading Regulations. Deferrals shall be in increments of five (5) days. If a vessel loading date or estimated loading date would, as a result of a deferral hereunder, be deferred past 10 January of the following contract year, such loading date shall be considered canceled, in which event the Seller will inform Buyer and discuss alternative shipping.

## C. LOADING

9.  At least thirty-five (35) days in advance of the beginning of the first of the twelve (12) laydays established pursuant to these Loading Regulations, Buyer shall give notice to Seller by email, telex or facsimile declaring seven (7) final laydays within the spread of twelve (12) laydays previously designated. In the event Buyer shall fail to give such notice as above provided, Seller shall, within five (5) days following the date on which such notice should have been given pursuant to this Clause, give notice to Buyer by email, telex or facsimile fixing seven (7) final laydays within the spread of twelve (12) laydays previously designated.

    As soon as practical, and in no event later than ten (10) days prior to the estimated arrival of the vessel at Port Kamsar and in no event later than seven (7) days prior to the estimated arrival of the vessel at Port Kamsar, Buyer shall give Seller notice by e-mail,

telex or facsimile setting forth the name of such vessel, its flag, deadweight tonnage, radio call letters, Master's name and nationality, length overall, maximum beam, estimated cargo quantity and quality, estimated time of arrival at Kamsar, ISPS certificate number and IMO number, port of destination and the entity responsible for the payment of port charges on its behalf. Within two (2) business days in Guinea after receipt of the said notification, Seller by notice to Buyer by email, telex or facsimile shall accept or reject the ship nominated.

Seller shall state in any notice of rejection the reason for rejection. If a ship is rejected, Buyer shall promptly arrange for another ship in its place and the procedure hereinbefore set out shall apply in respect of that ship and any subsequent ship nominated.

Buyer shall ensure that the Master of the ship notifies Port Kamsar by email, radio, facsimile or telex of the expected date and time of arrival of the ship at the pilot station at the port of loading at noon, ship's time, every other day commencing with the seventh day before it is expected that the ship will reach that point. Buyer shall or shall cause the Master to furnish Port Kamsar with such additional information and give such additional notices as shall be reasonably required by Port Kamsar. Port Kamsar shall acknowledge receipt of the initial ETA advice and shall provide information regarding berthing prospects.

No substitution of ships is permitted without the consent of the Seller.

10.     Each vessel shall be loaded at the standard rate of 24,000 metric tons for standard metal grade (SMG) bauxite and at the rate of 20,000 metric tons for low mono grade (LMG) bauxite per weather working day of 24 consecutive hours, Saturdays, Sundays and holidays included if lawful to work on such days.

Port Kamsar may, by written notice given to the vessel's Master no less than four hours in advance, require the vessel to leave berth prior to the loading of the quantity requested by Buyer as above provided. In this case, CBG shall indemnify Buyer against any

reasonable claim by the owner of the vessel for deadfreight resulting from such short loading. No vessel shall be required to leave berth prior to the loading of the quantity requested, less 5,000 metric tons.

Deadfreight shall be based on the quantity requested by Buyer, which shall not be greater per vessel than the lesser of (i) 61,500 metric tons or (ii) 110% of the nominated quantity or (iii) full permissible capacity of the vessel. "Full permissible capacity" shall mean the maximum tonnage which the vessel is able to carry in order (i) to leave the Port of Kamsar and (ii) to enter the discharge port, always safely afloat and in a seaworthy condition.

Except as provided in the second paragraph of this Clause 10, CBG's obligation to indemnify a Buyer for a claim for deadfreight resulting from short loading shall be limited to differences between requested quantity and bill of lading quantity which exceed 500 metric tons or 1.5% of the quantity requested, if greater.

Deadfreight capping per vessel at 60,000 metric tons is applicable when three or more vessels are anchored.

The above deadfreight capping shall not apply in respect of any vessel of more than 80,000 metric tons summer deadweight with vessel intake equal to or more than 75,000 metric tons.

11.   When the vessel is in all respects ready to load, Notice of Readiness to load shall be given to Port Kamsar (by radio if desired) in and out of office hours, Saturdays, Sundays and holidays included if lawful to work on such days, vessel in berth or not.

If berth is available, vessel shall proceed immediately to the berth.

If berth is not available, vessels shall anchor as directed by the Harbor Master. Notice of Readiness may be given only upon completion of these movements.

4

Laytime shall commence 12 hours after the vessel tenders Notice of Readiness, if such notice is given within the period of seven (7) final laydays, whether or not the vessel is in berth, unless loading commences sooner, in which case laytime shall commence when loading begins.

If any vessel tenders Notice of Readiness for loading before the commencement of the seven (7) final laydays declared under these Loading Regulations, CBG may load the vessel prior to the commencement of such laydays, and laytime shall commence when loading actually begins, but in no event later than noon local time on the first of the seven

(7) final laydays.

If any vessel tenders Notice of Readiness to load after the expiration of the seven (7) final laydays declared pursuant to these Loading Regulations, laytime shall commence when loading actually begins, except as hereinafter provided. If loading has not commenced within 96 hours after tendering of Notice of Readiness, laytime shall commence, unless loading shall actually begin sooner, 12 hours after the expiration of such 96-hour period, provided (a) CBG has been advised in writing as soon as possible and in any event prior to the expiration of the seven (7) final laydays fixed pursuant to these Loading Regulations, that the vessel will or may be delayed and the magnitude of such delay or possible delay and the reasons therefor and (b) the vessel actually arrives at Port Kamsar and gives Notice of Readiness within thirty (30) days after the beginning of the original twelve (12) laydays established. Such vessel shall be considered as having arrived and given Notice of Readiness upon expiration of such period of 96 hours, and shall be treated thereafter as having given Notice of Readiness within its seven (7) final laydays.

Vessels will normally be loaded on a turn-in-berth basis, with priority to vessels giving Notice of Readiness within their seven (7) final laydays.

In the event, following the giving of Notice of Readiness, a vessel becomes incapacitated so as to be unable to proceed to berth, load and depart under its own power, laytime, or the 12 hour period preceding the commencement of laytime, as the case may be, shall be

suspended as of the time of occurrence of the incapacity. Time shall recommence at such time as the vessel has been repaired and is, to the satisfaction of the Harbor Master, in all respects ready to load. If the vessel becomes incapacitated while at berth, the Harbor Master may require the vessel to be towed to an anchorage away from the berth at the vessel owner's expense.

Vessels loading at Kamsar must be able to deballast at a rate to support full loading over a 20-hour period. If this is not the case, upon prompt notice to Buyer, Port Kamsar can give notice to the vessel to sail at the second high tide (if vessel is seaworthy) and not be responsible for the deadfreight.

As per clause 10 paragraph 1, the loading rate is per weather working day of 24 consecutive hours. Any time lost because of rain, time shall not count as laytime for vessel loading and for any vessel waiting to load and within its laydays.

Time used in shifting from a designated anchorage to the berth or from a designated anchorage to another designated anchorage shall not count as laytime or time on demurrage.

Any time lost for opening hatches of holds to be loaded shall not count as laytime or time on demurrage.

Any time lost loading due to the vessel's inability to be loaded at the agreed rates or due to any other defect and/or default of the vessel, deficiency and/or default of vessel's personnel (including inability of the vessel to de-ballast at a rate commensurate with the loading rate) shall not count as laytime or time on demurrage.

The Statement of Facts and Port Log (documented and signed by CBG and the Vessel master) to include:

a) All shifting times indicating date and time of anchor aweigh and date and time of anchoring or all fast alongside wharf.

b) Any lost time to indicate date and time of when loading stopped, reason for such stoppage, date and time when problem rectified, and date and time of resumption of loading if different from time problem was rectified

12.     Demurrage, if any, shall be paid by Seller to Buyer for all time used in excess of the laytime allowed, fractions pro rata, at a rate calculated in accordance with the following formula:

$$D = \frac{R}{64,000}$$

Where:

D is the demurrage rate applicable in respect of a three (3)-month period, in cents (U.S.) per summer deadweight metric ton per day of 24 hours

R is the Estimated Representative Time Charter Rate (approximately 12 months) for Panamax Bulk Carriers, 64-65,000 dwt. (Rates shall be adjusted quarterly using a three month average as set forth in the following periods, (December-February) effective price date April 1, (March-May) effective price date July 1, (June-August) effective price date October 1, and (September-November) effective price date January 1, as published in <u>Drewry's Shipping Statistics and Economics</u>.)

Upon written request of the Buyer, Seller shall furnish Seller the demurrage rate applicable at such time. In the event the basis of the index "R" in the formulas set forth above is altered or if such index is no longer published, then Seller shall inform Buyer which index shall apply.

Despatch, if any, shall be paid by Buyer to Seller for all laytime saved, fractions of a day pro rata, at three-quarters the rate of demurrage, calculated in accordance with the foregoing formulas.

No demurrage shall be paid if delay is caused by events of force majeure at Port Kamsar and/or force majeure declared by CBG under its long term bauxite supply agreements (each a case of "**Force Majeure**").

In such cases of Force Majeure:

    a  If a vessel is on demurrage and has commenced loading, CBG and Buyer shall use their best efforts to complete the loading, and on completion thereof demurrage will cease.

    b.  Seller and Buyer shall use their best efforts to arrange for a prompt official clearance for the vessel, and on obtaining the same; the vessel shall proceed promptly to sea.

    c.  If a vessel is on demurrage and has not commenced loading, the vessel has the right to leave immediately if delivery of bauxite is excused by reason of an event of Force Majeure, or any time thereafter. Seller and Buyer shall use their best efforts to arrange for a prompt official clearance for the vessel, and on obtaining the same the vessel shall proceed promptly to sea.

    d.  If the vessel does not leave, demurrage will be limited to ten days following commencement of the period during which delivery of bauxite is excused by the terms of such Force Majeure.

    e.  If schedules are so disrupted, Buyer and Seller shall immediately consult with each other and arrange new shipping schedules.

13.     Buyer shall remove and replace all hatch covers and beams as required by CBG, Seller or Port Kamsar and shall assist in shifting the vessel when alongside the loading berth, should this become necessary. If failure on the part of the vessel promptly to perform these functions when requested results in lost loading time, such time shall not count as laytime. If shifting of vessel alongside the loading berth is requested, the vessel shall permit, for this purpose, the use of its winches and other appropriate gear and provide sufficient power for same at no cost to CBG, Seller or Port Kamsar.

**\*\*\*\*\*\*\*\*\*\*\***



## IMPALA TERMINALS BURNSIDE LLC
## BURNSIDE TERMINAL
## RULES AND REGULATIONS

## IMPALA TERMINALS BURNSIDE LLC
## 5050 HWY 44 DARROW, LOUISIANA 70725

## SECTION 1.  TERMINAL REGULATIONS

### 1.1.  General

**1.1.1   Use of Terminal.**  Use of the Terminal constitutes evidence of an agreement on the part of the User to accept and be covered and bound by these Rules and failure to execute or return a Berth Application or a Terminal Access Agreement shall not relieve User of its obligations hereunder.  The issuance by Impala of an Acceptance Notice or the berthing of any Vessel at the Terminal, shall constitute a contract by and among Impala, the Vessel and any Vessel Party (jointly and severally) to abide by the provisions of, and to be liable for the charges of whatsoever kind or nature in these Rules.  Notwithstanding anything to the contrary herein, the rights of any User to utilize the Terminal shall be subject to the prior approval of Impala. Impala reserves the right to deny access and/or use of the Terminal and/or to provide any services solely at Impala's discretion, including during changes in the applicable maritime security level, river conditions, or severe weather events.

**1.1.2   Hours of Operation.**  The Terminal operates 24 hours a day, every day throughout the year, excluding Holidays.

**1.1.3   Terminal Services.**  Services to be provided by Impala, subject to the terms and conditions of these Rules and upon the request of a User, are as set forth on Schedule 1 (Terminal Services and Rates) attached hereto.  Acceptance of services constitutes evidence of an agreement on the part of the User to be covered and bound by these Rules.

**1.1.4   Safe Berth.**  The Master of an Ocean Vessel and the captain/pilot of any tug attending a Barge shall be solely responsible for determining if the depth of water (at any tide or river stage) at the Berth or Buoys, as applicable, is sufficient for the Vessel to navigate, berth and load at the Terminal under any and all circumstances, with Impala having no responsibility therefor.  Impala shall not be deemed to guarantee or warrant the safety, depth or suitability of any berths, public channels, fairways, approaches thereto, anchorages or other publicly-operated or maintained areas, either inside or outside the area in which the Terminal operates, where the Ocean Vessel may be directed, including but not limited to the port area where any Vessel may operate, nor does Impala warrant or guarantee the absence of underwater hazards and obstructions in these waters. Impala shall not be responsible or liable for any loss, damage, expense, injury or delay to the Ocean Vessel resulting from the use of such public waterways. Furthermore, Impala shall not be deemed to, and does not warrant the safety and security of the Terminal, including the Berth and Buoys.

**1.1.5   Remedies for Enforcement of Terminal Rules.**  Impala shall have all remedies available to it by law, in equity or in admiralty to enforce these Rules, including, but not limited to, suspending Terminal operations and/or the provision of services hereunder.  Impala shall also have all remedies available at law, in equity and/or in admiralty available to it to collect all fees, charges, and/or damages due hereunder, including, but not limited to liens against the Vessel and/or Cargo for such fees, charges, and/or damages.  In the event Impala engages counsel to enforce any provision of these Rules, Impala shall be entitled to recover its expenses incurred in such proceedings, including but not limited to attorneys' fees and all costs.

**1.1.6   Fees and Charges.**  All fees and charges hereunder must be paid in advance to the Terminal based on the estimated fees prior to a Vessel's berthing unless otherwise mutually agreed in writing by Impala and the Vessel Party, and such fees and charges shall be paid as set out in Section 1.4.  All Invoices will be paid via Electronic Transfer unless otherwise arranged in advance.

**1.1.7   Amendments/Interpretation.**  Amendments to these Rules may be issued from time to time.  These Rules are subject to change without notice.  Impala shall be the sole judge as to the interpretation of these

Rules.

**1.1.8   Independent Contractor.** User and/or Vessel Party acknowledges and agrees that Impala is retained by and has contracted with User only for the purposes set forth in these Rules or any Customer Contract, and Impala shall perform all Services hereunder or thereunder as an independent contractor and under no circumstances shall Impala or any of Impala's employees, agents, contractors, or subcontractors be considered an employee, agent, or servant of User.

**1.1.9   Private Terminal.** Notwithstanding anything to the contrary herein, the facility is a private terminal facility and Impala is not a marine terminal operator as defined by the Shipping Act of 1984, as amended. Common carriers by water (such as liners), as defined by the Shipping Act of 1984, as amended, will not be accepted for loading or unloading at the Terminal. Only Vessels engaged in private or contract carriage pursuant to private commercial arrangements will be accepted by Impala for berthing at the Terminal.

**1.1.10   Entirety of Agreement.** The Rules shall control over any written agreement between Impala and User or Impala and any of its customers (each a "Customer Contract"), except that to the extent the Rules conflict with any provision of such Customer Contract, the conflicting provision of the Customer Contract shall control. In case any provision (or portion thereof) contained in these Rules should be held or determined invalid, illegal, in conflict with a Customer Contract or unenforceable in any respect, the validity, legality and enforceability of the remaining portion of any such provision and the other remaining provisions or underlying rights and obligations referred to herein shall not in any way be affected, modified, or impaired thereby.

## 1.2.   Terminal Safety and Security

**1.2.1   Safety and Security.** All Vessels are to furnish, at all times while in the Berth or at the Buoys, safe means for persons to board and disembark from the Vessel. When a Vessel is in the Terminal, the relevant Vessel Party shall be solely responsible for the safety of the Vessel and her crew. Any Vessel in Berth or at the Buoys shall at all times maintain appropriate officers and crew aboard the Vessel in order to maintain an alert watch and respond to emergencies. The Vessel's officers and crew shall at all times be responsible for monitoring the Vessel moorings and lines, and shall make adjustments to the moorings and lines during loading and unloading operations as necessary, to ensure the Vessel is secure.

**1.2.2   Drug and Alcohol Policy.** Impala warrants, undertakes and represents that, as of the effective date of these Rules, Impala has an active drug and alcohol abuse prevention policy which complies with all applicable laws and industry trade regulations. Impala further warrants, undertakes and represents that such policy will remain in effect at all times while these Rules remain in effect and that Impala shall exercise due diligence to ensure compliance with such policy by the personnel provided by Impala in performance of any services hereunder.

## 1.3.   Compliance and Vessel Party Responsibility

**1.3.1   Compliance with Laws and Regulations.** Prior to coming into the Terminal, all Vessels shall have fully complied with all applicable U.S. Coast Guard regulations and all applicable local, state and federal laws and regulations in effect while the Vessel is at the Terminal. In no event shall loading or unloading of an Ocean Vessel, as the case may be, occur until such time as such Ocean Vessel has been cleared by U.S. Customs. If any Vessel fails to comply with all such laws and regulations, Impala may order the Vessel to vacate the Berth or Buoys (as applicable). If the Vessel does not vacate the Berth or Buoys (as applicable) when so ordered, the Vessel will be subject to, in addition to the liquidated damages set forth under Section 5.8, all costs and expenses, including, but not limited to, attorneys' fees and costs, in connection with the moving of the

Vessel, which costs, expenses and liquidated damages shall be for the account of and the full risk of the Vessel and the Vessel Party.

### 1.3.2   User and Vessel Party Liability, Responsibility and Indemnification

a.      Impala shall not be responsible for any loss or damage to Cargo and/or Vessels calling upon and/or utilizing the Terminal.

b.      **NOTWITHSTANDING ANYTHING TO THE CONTRARY, IN PROVIDING SERVICES UNDER THESE RULES AND SUBJECT TO ANY LIMITATIONS AGREED BY THE PARTIES IN A CUSTOMER CONTRACT, IMPALA SHALL NOT BE RESPONSIBLE FOR ANY DEMURRAGE OR OTHER DAMAGES FOR ANY LOSS OF TIME, DELAY, DEMURRAGE, OR ANY OTHER DAMAGES INCURRED BY ANY USER, VESSEL OR ANY VESSEL PARTY AND/OR THE CARGO, EXCEPT TO THE EXTENT DUE TO (I) IMPALA'S GROSS NEGLIGENCE, (II) IMPALA'S FAILURE TO ACHIEVE THE LOADING RATES IN SECTION 2 WHILE THE APPLICABLE VESSEL IS ON LAYTIME (EXCEPT DURING A FORCE MAJEURE EVENT OR DECLARATION), OR (III) AS SET FORTH IN SECTION 5.7. NOTWITHSTANDING PROVISION, IMPALA SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL DAMAGES OR LOST PROFITS.**

c.      The Vessel Party shall have the duty to be fully familiar with the environmental rules, regulations and laws in respect to the type and levels of all discharges allowed in United States rivers, coastal waters and air, and for fully abiding by said rules, regulations and laws. Impala will report any observed act by a Vessel or Vessel Party suspected to be a violation of any such rule, regulation or law to the appropriate governmental authority.

d.      All Vessel Party's and Users hereby agree to **RELEASE, PROTECT, INDEMNIFY, DEFEND AND HOLD HARMLESS** Impala and all persons, firms or other entities which may manage, own or control the operations of said Terminal, and its and their respective officers, directors, employees, agents, subcontractors and vessels and the insurers of all (collectively, the "Impala Group") from and against any and all Claims, inclusive of Claims made by third parties, arising from or relating to, (a) the loss of life, bodily injury, disease, or any other injury of any type whatsoever, involving any person, including Visitors, and (b) damage, contamination or loss of property, and including the User's Cargo, incident to or resulting from their use of the Terminal, and **WHETHER OR NOT CAUSED BY THE SOLE AND/OR CONCURRENT FAULT OR NEGLIGENCE OR STRICT LIABILITY OF ANY MEMBER OF THE IMPALA GROUP, OR UNSEAWORTHINESS OF ANY VESSEL, EXCEPT TO THE EXTENT CAUSED BY THE PROVEN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE IMPALA GROUP.**

e.      Additionally, such obligation of Vessel Party's and Users to **RELEASE, PROTECT, INDEMNIFY, DEFEND AND HOLD HARMLESS** the Impala Group shall include, but not be limited to, loss, penalty, fine, clean-up costs, natural resource damage, remediation costs, removal costs, demurrage, administrative costs and any and all other costs and liabilities that arise directly or indirectly from pollution caused or threatened by (a) a Vessel Party or other master or crew of the Vessel, whether in loading and/or unloading of Cargo, or in the operation or management of the Vessel; or (b) any escape, release, discharge, threat of discharge, or disposal of fuel, pollutants or hazardous materials from any of User's or Agents' vehicles or equipment or otherwise caused by User or Agents while in, on, or adjacent to the Terminal **EVEN IF CAUSED BY THE SOLE AND/OR CONCURRENT FAULT OR NEGLIGENCE OF ANY MEMBER OF THE IMPALA GROUP, STRICT LIABILITY OR UNSEAWORTHINESS OF ANY VESSEL, EXCEPT TO THE EXTENT CAUSED BY THE PROVEN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE IMPALA GROUP.** In the event of an actual or threatened pollution event arising

directly or indirectly out of services being performed at the Terminal, the Vessel Party shall, and shall cause its representatives and insurers to, immediately:

    i.  Notify all local, state and federal authorities having jurisdiction of the pollution event.

    ii.  Notify Impala of all details of the pollution event and provide Impala with an MSDS of all hazardous and/or non-hazardous materials that Terminal employees or third parties may be exposed to.

    iii.  Take all steps to eliminate the cause and/or source of the pollution.

    iv.  Take steps to clean up the pollution.

    v.  Take all steps required by law to restore the environment.

    vi.  Take all steps to mitigate damages of the Vessel Party, Impala and third parties.

    vii.  Promptly pay all fines and penalties, and damages and losses of third parties, to the extent required by law, and for all costs and expenses of clean up.

    viii.  If necessary, advance or pay monies and funds required to be paid to the appropriate regulatory agencies.

    ix.  Consult with Impala and keep Impala regularly informed of all steps taken and contemplated to comply with the provisions of this paragraph.

    x.  Cooperate with Impala in issuing statements to government authorities and media representatives.

Whether or not the User or the Vessel Party has complied with the provisions of the foregoing, Impala in its sole discretion and without notice to the Vessel Party may, but shall not be required to, take over and manage all emergency response, prevention, clean-up, containment and restoration activities, all without derogation or diminution of the Vessel Party's obligations under these Rules, and with full reservation to Impala of all rights against the User, Vessel, the Vessel Party or its insurers for reimbursement of costs, expenses and attorneys' fees. In such event, the User and/or the Vessel Party shall, and shall cause its insurers and any subcontractors to, make available to Impala all Vessels, personnel and equipment used or planned to be used in such prevention, clean-up and restoration efforts, all at the sole expense of the Vessel Party. Nevertheless, Impala may, but is not required to, utilize its own and contracted personnel, Vessels and equipment in such prevention, clean-up and restoration efforts, and may at its discretion, allocate such resources as it, in its sole discretion, deems appropriate and at the sole expense of the User and/or Vessel Party. In the event Impala takes over and manages such prevention, clean-up and restoration efforts, such action shall not be deemed a waiver, or constitute an estoppel by Impala or an admission of any fault or responsibility on the part of Impala.

### 1.3.3  Insurance

    a.    The User shall obtain at its sole cost and expense and shall carry and maintain in full force and effect, and cause any Vessels owned, chartered or operated by the User and used in the transfer, loading, or unloading of the Vessel to obtain and maintain insurance coverages with insurance companies rated not less than A-, IX by A.M. Best or otherwise reasonably satisfactory to Impala of the following types and amounts:

    i.  Hull and Machinery Insurance on each Vessel, in an amount not less than the fair market value

of the Vessel, with navigation limits adequate for the Vessel's trade.

ii. Protection and Indemnity ("P&I") Insurance provided through any combination of (i) full entry with a P&I Club (that is a member of the International Group of P&I Clubs); and/or (ii) policy(ies) with a commercial insurance company(ies) or underwriters/syndicate(s) acceptable to Impala with terms no less broad than those customarily carried by similar marine carriers with limits of not less than ten million ($10,000,000) per occurrence. Such P&I insurance shall include coverage for injury to or death of master, mates, and crew; tower's liability for tugs, excess collision liability; cargo legal liability; pollution liability; and contractual liability. In addition, any towboat or tug utilizing the Terminal shall carry tower's liability insurance.

iii. Pollution Liability Insurance, either by endorsement to the appropriate insurances named above, or by separate insurance with an insurance company(ies) or underwriters/syndicate(s) rated not less than A-, IX by A.M. Best or otherwise reasonably acceptable to Impala with limits of not less than two hundred million ($200,000,000) per occurrence or the maximum amount required under the Oil Pollution Act of 1990 ("OPA90") and any amendments thereto, whichever is greater, covering any and all environmental risks, penalties, action or otherwise and equivalent to that coverage provided by Lloyd's of London Pollution Policy/Environmental Pollution Group. COFRs shall also be maintained on all Vessels loading or unloading at the Terminal.

iv. All risk cargo insurance, in an amount not less than one hundred and ten percent (110%) of the fair market value of the cargo.

v. Workers' Compensation and Employer's Liability Insurance, with United States Longshore and Harbor Workers Compensation Act endorsement and with the maritime endorsement, with minimum limits as required by federal or state law.

vi. Commercial General Liability Insurance, including contractual liability cover, with any "watercraft exclusion" being deleted, and in an amount of not less than twenty five million ($25,000,000) per accident or occurrence, which may be structured through excess or umbrella policies.

vii. Excess Liability or Bumbershoot Liability Insurance with limits of not less than five million dollars ($5,000,000) per occurrence and in the aggregate providing additional limits of insurance of the coverage described above.

viii. Any additional insurance coverages required by state or federal law.

b.      The User will provide Impala, upon request, with a copy of relevant certificate(s) of insurance evidencing the insurance coverages required hereunder. Acceptance of any such certificate shall not constitute a waiver, release or modification of any of the required insurance coverages and endorsements if the certificate is inconsistent with those coverages and endorsements. The insurance coverage required under these Rules shall cover the User's liabilities and obligations as set forth herein and shall be endorsed to (i) contain waivers of subrogation rights against the Impala Group, (ii) name the Impala Group as additional insureds (except the Workers' Compensation Policy); and (iii) provide that such insurance is primary with respect to all insureds and that the Impala Group's insurance shall be noncontributing under any and all circumstances.

c.      The insurance requirements set forth herein shall not in any way limit any User's or Vessel's legal and/ or contractual obligations and liabilities under any Customer Contract or in connection with these

Rules. The insurance coverages required hereunder will be maintained by each primary named insured at its sole cost and expense at all times during the term of any Customer Contract including any premiums, deductibles and self-insured retentions. If liability for loss or damage is denied by the insurer(s) of a Vessel Party and/or the Vessel, in whole or in part, because of the (i) breach of any policy for the insurance coverages required hereunder, (ii) failure to obtain or maintain any of the insurance coverages required hereunder, or (iii) in any other breach of these Rules or the User's and/or Vessel's contract of insurance with its carrier, **USER'S AND/OR VESSEL SHALL RELEASE, PROTECT, INDEMNIFY, DEFEND AND HOLD HARMLESS THE IMPALA GROUP AGAINST ALL CLAIMS.**

**1.4.   Additional Services and Invoicing**

      **1.4.1   Invoicing.** Impala shall render invoices according to <u>Schedule 1</u> for services provided hereunder or under any Customer Contract and the User agrees to pay said invoices upon receipt by User and any agent of User guarantees payment of all fees earned and due hereunder. The invoice shall also contain reconciliation for any fees or charges which were secured with a pre-paid, estimated amount. Any invoice that remains unpaid after 10 days from date of invoice shall earn interest, compounded at 1.5% interest per month or portion thereof or the maximum legal interest rate allowed under Louisiana law, whichever is greater. Any pending or alleged Claims against Impala will not be allowed as an offset against outstanding or accrued charges.

      **1.4.2   Bunkers.** No bunkers, diesel fuel or oils may be received or taken aboard by Vessels in Berth or at the Buoys unless prior arrangements are made with and agreed to in writing by Terminal.

      **1.4.3   Repairs. Once the NOR has been tendered, no repairs that would impede the movement of the Vessel or that would interfere with Cargo transfer operations or otherwise affect safety at the Terminal shall be undertaken by the Vessel or a Vessel Party.**

      **1.4.4   Visitors and Delivery of Vessel Provisions.** In its sole discretion, Impala reserves the right to deny access to any Visitor. Every person entering the Terminal must sign in with the Terminal office before proceeding to any Vessel, Berth or Buoy and shall furnish Impala with identification acceptable to Impala. Any person or vehicle that enters the Terminal shall be subject to a search conducted in accordance with Impala's Facilities Security Plan. Such Visitors, subject to the prior approval of Impala, may arrange for outside transportation for pickup and delivery at the Terminal. Approved Visitors may gain access to Vessels berthed at the Berth or at the Buoys via Impala's crew boat service. Such service shall be provided at the sole expense and for the account of the Vessel or the Vessel Party as set forth in <u>Schedule 1</u> under "Access Fee." Such access, however, shall require that the Visitor furnish 24 hours prior written notification to the Terminal office of same. All Visitors must wear protective equipment, steel-toed boots, hard hats, safety glasses and life jackets. Delivery of provisions or stores to any Vessels berthed at the Terminal shall require the prior approval of Impala subject to a determination by Impala as to whether such activities will interfere with Cargo operations or Vessel arrivals, departures or shifting. An agent of the Vessel must be present when provisions are to be brought on to a Vessel. Any Visitor shall execute such releases and indemnity agreements as required by Impala as a condition to being allowed access to the Terminal, including, but not limited to, a Terminal Access Agreement, a form of which is attached hereto as <u>Schedule 3</u>.

      **1.4.5   Special Contracts and Emergency Rates.** Charges for services or items not specifically provided for in these Rules shall be assessed pursuant to a separate Customer Contract with Impala. In the event of an emergency or upon User's request for services or items not specifically provided for in these Rules or in a separate Customer Contract with Impala, any such services or items requested by or provided for the benefit of User shall by assessed as follows: (a) all services or items directly provided by Impala shall be assessed at Impala's standard and customary rate for such services or items; and (b) all third-party services or items obtained

by Impala for the benefit of User shall be assessed at 130% of the rate charged to Impala by the third-party contractor.

**1.4.6    Liens.**  All charges made by or due to Impala shall constitute a lien in favor of Impala upon the Cargo and against any Vessel for such charges to the fullest extent permitted by law.  Impala shall have the right to retain possession of Cargo and/or relocate a Vessel and its belongings within Terminal property if necessary to preserve and maintain its lien rights for any amounts due hereunder to Impala.  Impala shall have no liability to the Vessel Party by retaining and/or relocating Vessel and its belongings at the Terminal.  To the extent allowed under the General Maritime Law of the United States, the parties agree that delivery or transfer of the Cargo by Impala is not a waiver of any lien rights Impala has against the Cargo and that said rights survive transfer and/or delivery of said Cargo and apply to any Cargo of User in possession of Impala.

## 1.5.    Access to the Terminal

Impala hereby grants User and such of its agents, representatives and invitees (collectively, "Agents") and each of its and their employees, all as designated in writing to Impala from time to time the right and privilege to access the Terminal.  User shall be absolutely responsible and liable for its Agents and their actions, and for their compliance and/or non-compliance with this Agreement.   Such access shall be conditioned on the following requirements:

**1.5.1    Compliance with Rules, Laws and Regulations.**  User, its Agents and each of its and their respective employees shall access the Terminal in a manner as to cause minimum interference with Impala's operations.  User agrees to and to cause its Agents to (i) comply with all rules posted by Impala at the Terminal, (ii) comply with all federal, state and local laws, statutes, ordinances, rules, and regulations that may be applicable to User's and its Agents' activities at the Terminal, and (iii) obtain all permits and licenses required by law.

**1.5.2    Controlled Substance Abuse.**  User shall have adopted policies and procedures to ensure a drug and alcohol free work place, and enforce its policy with appropriate drug and alcohol testing programs.   All testing programs shall specify substances, testing frequency and threshold levels, which, at a minimum comply with the Department of Transportation drug testing regulations.

**1.5.3    Safety of Vehicles and Equipment.**  User agrees that all vehicles and equipment owned, leased or otherwise under the control of User and its Agents will be properly maintained, and in a safe condition.  User shall remove any equipment that in Impala's discretion poses a safety hazard at the Terminal.  In the event User fails to remove such unsafe equipment, Impala has the right to remove such equipment with User paying or reimbursing Impala for the cost of such removal.

**1.5.4    Incident Reporting.**  User must report all incidents (including accidents and near misses) that occur at the Terminal in writing to Impala within 24 hours following such incident.  The report should describe the incident and include any investigative materials or documents that User completes, and any related documentation and reports submitted to any entity, including but not limited to, any governmental agency, User's insurer, or others.

**1.5.5    No Agency Relationship.**  Neither User nor its Agents act under the direction, control or supervision of Impala and none of the foregoing is an agent of Impala.

## SECTION 2. TERMINAL SPECIFICATIONS

## 2.1.    Terminal Location

The Terminal is located at Darrow, Louisiana, on the left Descending Bank of the Mississippi River. The Buoys are located at mile marker LMR 169.2. The Berth is located at mile marker LMR 169.5.

## 2.2.   Midstream Operations

Description of Buoys

5 buoys with a capacity of 150 metric tons each
The upstream buoy is located at a distance of approximately 1,235 feet from the downstream buoy.

Limitations

Maximum Length Overall: 230 meters / 755 feet
Maximum Beam: 32.2 meters / 105.6 feet
Maximum Displacement: 85,600 metric tons
Maximum Air draft: 17 meters / 56 feet

Loading Rate

Loading Rate (per Weather Working Day) shall be per the terms of the Customer Contract.

## 2.3.   Terminal Operations

Berth Description

Length of Berth: 335 meters / 1,100 contiguous feet
Length of Dock: 267 meters / 875 feet
Water Depth at Dock: 14 meters / 46 feet low water draft
Spout Reach from face of Dock: 40 meters / 131 feet

Ocean Vessel Limitations

Maximum Length Overall: 270 meters / 886 feet
Maximum Beam: 43 meters / 141 feet
Maximum Displacement: 169,500 metric tons (when fully loaded)
Maximum Air draft: 18.6 meters / 61 feet

Barge Unloading Limitations/Requirements

Maximum Width: 10.7 meters / 35 feet
Maximum Length: 62.5 meters / 205 feet

Loading Rate

Loading Rate (per Weather Working Day) shall be per the terms of the Customer Contract.

## 2.4   Accuracy of Terminal Specifications

All descriptions and dimensions provided within this Section 2 are approximate, and Impala *makes no warranty or guarantee of the accuracy of this information*; provided, however, Impala guarantees the loading rates in Section 2.2 and Section 2.3 subject to the other terms hereof and any separate agreement between Vessel Party and Impala. The loading-rate guarantees in Section 2.2 and Section 2.3 will be adjusted if the Ocean Vessel has ship gear or other features that impede the normal loading capabilities of Impala. Guaranteed loading rates do not apply on Holidays.

## SECTION 3. VESSEL NOMINATIONS

### 3.1.   Nominations

**3.1.1   Ocean Vessel Nominations.**  Ocean Vessel nominations shall be furnished to Impala by confirmed receipt e-mail to BurnsideShips@ImpalaTerminals.com not earlier than 30 days and not later than 15 days prior to the Ocean Vessel's projected ETA at the Terminal. Such nomination shall include the Ocean Vessel IMO number, tonnage, loading drafts, name of carrier, and type of Cargo carried or to be carried and shall include the additional information below based on type of Vessel. Acceptance by Impala of a nomination of a Vessel or scheduling of Barges shall be evidenced by Impala's confirmation by e-mail transmittal to the relevant Vessel Party, and Impala must respond to such nomination with 24 hours.

**Ocean Vessel (> 60,000 metric tons):**

a.  Vessel Party shall request from Impala, in writing, a 10-day Layday Period at least 30 days prior to the date of the first day of the Layday Period. Impala shall advise Vessel Party in writing within 24 hours whether or not the proposed Layday Period is acceptable. If the proposed Layday Period is not acceptable, Impala shall offer Vessel Party an alternative Layday Period for Vessel Party's consideration.

b.  No later than 15 days from the date of the first day of the agreed-upon Layday Period, Vessel Party shall identify in writing to Impala a 5-day Laycan within such original Layday Period. In each case mentioned above, the written approval of Impala shall be required relative to the 10-day Layday Period and the 5-day Laycan.

**Ocean Vessel (< 60,000 metric tons):**

a.  Vessel Party shall request from Impala, in writing, a 7-day Layday Period at least 30 days prior to the date of the first day of the Layday Period. Impala shall advise Vessel Party in writing within 24 hours whether or not the proposed Layday Period is acceptable. If the proposed Layday Period is not acceptable, Impala shall offer Vessel Party an alternative Layday Period for Vessel Party's consideration.

b.  No later than 15 days from the date of the first day of the agreed-upon Layday Period, Vessel Party shall identify in writing to Impala a 4-day Laycan within such original Layday Period. In each case mentioned above, the written approval of Impala shall be required relative to the 7-day Layday Period and the 4-day Laycan.

**3.1.2   Barge Requirements.**  The Vessel Party shall provide the following information on each Barge not later than 7 days prior to the projected ETA of the Barge at the Terminal: the individual barge number, tonnage, loading drafts, name of carrier, projected ETA, a designation of whether the Cargo is to be delivered to the storage pad or held for direct transfer to Ocean Vessel, and the type of Cargo carried or to be carried, which report shall be subsequently updated on the Monday of each week until such Barges are received at the relevant fleet. All Users and their Barges utilizing the facilities and services of Impala shall be subject to and shall abide

by the terms and conditions of these Rules.

## 3.2.    Filing

      All Ocean Vessels and Vessel Parties which intend to utilize the facilities and services of Impala shall file with Impala by confirmed receipt e-mail to BurnsideShips@ImpalaTerminals.com, a Berth Application stating the projected ETA of the Vessel.  The Berth Application must be received by Impala no later than 15 days prior to the projected ETA of the Ocean Vessel.  An executed original of the Berth Application must be maintained by the Ocean Vessel or Vessel Party.

Acceptance by Impala of a Berth Application shall be evidenced by Impala's issuance to the Vessel Party of a Berth Application acceptant notice ("Acceptance Notice") confirming the projected ETA as the scheduled ETA. The Vessel shall send to Impala by e-mail updated ETAs as follows: 10 days, 5 days, 48 hours, 24 hours, 12 hours, 6 hours prior to arrival.

## 3.3    Vessel Scheduling

      Subject to Section 5.7, Impala will endeavor to berth Ocean Vessels in order of nomination acceptance, subject to (i) timely receipt of ETA updates, (ii) arrival within the agreed-upon Laycan, and (iii) compliance with the other terms hereof; provided, however, that Impala shall have the right to assign Vessels to the Berth or Buoys, in its sole discretion, for whatever reasons, in whatever order it determines, including subject to conditions at the Terminal including Terminal, port, or river closures, Terminal or port restrictions, Terminal or port congestion, or weather and river conditions and other conditions beyond Impala's reasonable control.

## 3.4.    Certification for Filing

      In the case of an Ocean Vessel, the following certificates and documents must be presented to Impala to file for a berth at the Terminal:

    i.  An original Berth Application signed by the authorized Vessel Party.

    ii.  A copy of the NOR executed by the authorized Vessel Party.

    iii.  A customary hold cleanliness certificate.

    iv.  International tonnage certificate.

    v.  A proposed stowage plan which includes Cargo cubic capacity for any Ocean Vessel to be loaded and the loading sequence or the actual plan for Cargo to be unloaded including the unloading sequence.

    vi.  Should it be necessary for Vessel personnel to leave the Vessel or Visitors, including Vessel's agent, to board the Vessel, 24 hours prior written notification to Impala must be provided and include a list of the: (a) name, (b) address, (c) telephone number and (d) reason for visit.  Each visitor to the Vessel and Vessel personnel leaving the Vessel must be on the a visitor list ("Visitor List").  Each Visitor must have a form of identification acceptable to Impala.  The Visitor List shall be supplemented as needed and furnished in advance of the visit to Impala in writing between 7:30 a.m.  and 4:00 p.m. Mondays through Fridays, excluding Holidays.  Any Vessel personnel leaving the ship shall be required to furnish Impala with a Crewman's Landing Permit — Form 1-95 issued by the U.S. Immigration & Naturalization Service and a picture identification card.

vii. Any special loading or unloading instructions, including instructions regarding the specific location of structural or other protruding objects in the Vessel's cargo hold(s) that could be damaged during loading or unloading.

## 3.5.   Notice of Readiness

Once the Ocean Vessel to be loaded is (a) located at the Berth, the Buoys, or the closest available safe anchorage to Darrow, Louisiana, and (b) ready and suitable in all respects to commence loading, the master of the Ocean Vessel shall tender a NOR whether cleared at customs or not, whether in free pratique or not, whether in port or not, and whether in berth or not. The issuance or acceptance of NOR by any other party under any charter party or contract to which Terminal itself is not a party shall have no effect under these Rules. Impala shall not be required to accept the NOR unless and until the NOR is tendered within the applicable Laycan.

## 3.6.   Laytime; Demurrage for Failing to Meet the Guaranteed Loading Rate; Despatch

Laytime commences upon the earlier to occur of: (a) 12 hours after the Ocean Vessel has properly tendered a NOR, or (b) when a Vessel is secured All Fast and is ready to load in all respects, provided that time consumed for the following shall not count as Laytime (or time on demurrage):

  i. Time consumed by the Ocean Vessel in moving from port anchorage to the Berth, including waiting for tide, traffic, or daylight, and time consumed during draft surveys;

  ii. If loading starts before the completion of the 12-hour period after NOR ("turn time"), then only actual time used shall count as Laytime until expiration of such turn time;

  iii. Any delay due to inability of the Ocean Vessel's facilities to safely discharge or receive Cargo for any reason;

  iv. Any time consumed in interruption of transportation operations due to the Vessel's failure to comply with terminal regulations (including, but not limited to, these Rules);

  v. Delay due to prohibition of Cargo transfer at any time by the Vessel, the owner or operator of the Vessel, or by governmental authorities, unless such prohibition is caused by Impala's failure to comply with applicable laws;

  vi. Delays due to awaiting customs and/or immigration clearance and pratique, if applicable;

  vii. Any delay caused by strike, lockout, stoppage or restraint of labor of the Master, officers and crew of the Vessel or pilots or any delay for which a Vessel Party, the Vessel, her Master or crew is responsible; or

  viii. Any delay caused by conditions not reasonably within Impala's control, including but not limited to, weather, equipment failure, awaiting tide, Force Majeure, blockage of channels caused by spills or accidents, etc.

Laytime ends when the Ocean Vessel has completed loading.

Subject to the foregoing, the amount of Laytime for a given Ocean Vessel equals the actual quantity of Cargo to be loaded onto the Ocean Vessel divided by the pro rata guaranteed load rate as referred to in the Customer

contract.

To the extent Impala exceeds the applicable amount of Laytime for an Ocean Vessel, Impala will reimburse Vessel Party for actual vessel demurrage incurred, invoiced, and paid in accordance with the demurrage rate as set forth in the charter party provided by Vessel Party to Impala prior to Ocean Vessel's arrival at the Terminal. Upon request from Impala, Vessel Party shall immediately supply Impala with a copy of the charter party. Notwithstanding the foregoing, the demurrage shall be reasonably in line with the daily hire rates for the Ocean Vessel at the time of entering the charter party. Vessel Party shall pay despatch compensation to Impala for time saved by exceeding the applicable guaranteed loading rate at an amount equal to 50% of the demurrage rate in the applicable charter party documents.

Notwithstanding anything to the contrary, Vessel Party waives any demurrage claim to which it may be entitled if Vessel Party does not provide notice to Impala on or before 60 calendar days after the date on which the applicable Ocean Vessel completes loading.

### 3.7. Closest Available Anchorage

Ocean Vessels filing a Berth Application to utilize the Terminal normally will be required to anchor at Burnside Anchorage (mile marker LMR 169.2–169.5), or the closest available anchorage to Darrow, Louisiana.

The Vessel Party acknowledges that any Vessel arriving at the Terminal with Cargo on its deck that may constitute a hazardous and unsafe condition will render any NOR invalid. The Vessel Party agrees that if notified of such condition the Vessel Party shall clean and remove any such Cargo from the deck of the Vessel. Should the Vessel Party fail to promptly clean and remove Cargo from the deck of any such Vessel, Impala shall have the right, but not the obligation, to clean and remove the Cargo from the Vessel's deck, which service will be solely for the account of the Vessel Party. Alternatively, Impala may reject the Vessel and refuse to accept it at the Terminal.

The Vessel Party shall coordinate and be solely responsible for all required inspections for cleanliness and compliance with all applicable laws and regulations relative to the fitness of the Vessel. All run off reporting and other environmental compliance and reporting shall be the Vessel Party's sole responsibility. Any EPA, regulatory, or court imposed fines and penalties levied against Impala as a result of a Vessel Party's non-compliance and/or failure to report shall be for the Vessel Party's account.

Upon assignment to the Berth or Buoys, the Ocean Vessel shall remain prepared and be properly crewed to promptly carry out Cargo transfer operations within or between the Terminal's Berth or Buoys, and undock and vacate the Terminal on order of Impala 24 hours a day, 7 days a week, with any crew of the Ocean Vessel. For purposes of these Rules, "promptly" shall mean within 3 hours of notice being tendered by Impala.

In the event that the Ocean Vessel fails to proceed to the Terminal as required by the preceding paragraph, Impala may, in its sole discretion, and without liability to anyone, bypass the subject Ocean Vessel, and the Ocean Vessel and the Vessel Party shall be responsible for a dead berth charge of 115% of the then-current hourly dockage rate per hour (with partial hours prorated) as liquidated damages until the Ocean Vessel is moored at the Terminal, regardless of intervening circumstances of any nature.

### 3.8. Re-filing

If any Ocean Vessel that has filed a Berth Application is ordered by Impala to proceed to the Terminal and is unable or refuses to accept such order, due to any reason whatsoever, or otherwise fails to comply with

these Rules, Impala may, at its sole discretion, cancel the Ocean Vessel's original filing. If a filing is cancelled, the Ocean Vessel must re-file a Berth Application and will be assigned a rotation in the Terminal berthing queue based upon the new filing time.

## SECTION 4. CARGO OPERATIONS

### 4.1.    Vessel Loading and Unloading

Impala requires the full cooperation of the master, crew and agents of all Vessels loading and unloading at the Terminal. This includes, but is not limited to the following:

   i. The Vessel's master and chief mate are responsible for the proper loading and unloading of their Vessel.

  ii. Shore scales are NOT accurate and should be used as a guide only. It is the responsibility of the Vessel's officers, and not Terminal personnel, to stop loading and unloading — not only when the desired draft has been reached but also prior to reaching the maximum quantity of Cargo.

 iii. There are approximately 100 metric tons of Cargo on the belt, which must be loaded or unloaded before the belt can stop. Increments of less than 100 metric tons can only be approximated.

  iv. The Vessel Party must provide a loading or unloading plan prior to arrival but not later than boarding by Terminal personnel. Any change to the loading or unloading must be given in writing to Terminal personnel.

   v. The Vessel Party must provide particulars including LOA, beam, hatch configuration, dimensions, and spacing, cranes, as well as on deck obstructions and any structural or other protruding objects in the Vessel cargo hold (including any that may be covered by Cargo).

  vi. Vessel pumping ballast and de-ballast as and when requested by Impala as well as stopping ballast removal at the request of Impala.

 vii. Vessel arriving above the air draft specified by Impala.

viii. Vessel maintaining an All Fast condition in the Berth or at the Buoys before, during, and after loading or unloading.

  ix. Shifting the Vessel in the Berth or at the Buoys at the direction of Impala 24 hours per day if necessary in Impala's reasonable discretion.

   x. During Vessel trimming, Impala shall not be required to load Cargo into more than two hatches after completion of the load plan unless the Vessel pays Impala detention charges based on 15 minute intervals and 115% of the then-current hourly dockage rate.

  xi. Relocating or rotating the Vessel's gear to clear the hatches and or loading/unloading system immediately upon request by Impala at any time while the Vessel is at the Berth or Buoys.

 xii. Opening or closing hatches as and when requested by Impala, including prior to boarding by the Terminal personnel upon arrival and completion of berthing (i.e., when All Fast in the Berth or at the

Buoys).

xiii. Upon request by Impala, a suitable space shall be made available on board a Vessel for the Terminal's load master and/or loading personnel for use during weather delays and while calculating stowage or loading systems.

xiv. In the event of a loading or unloading system breakdown or berth system damage, the Vessel shall provide all necessary assistance to reduce damages and/or to assist Impala in resuming the loading or unloading activity.

xv. The loading or unloading of any Cargo via the Terminal's equipment shall constitute acceptance, in full, of all provisions in these Rules. Failure of a Vessel Party to sign any forms or the modification of any forms by a Vessel Party shall not relieve such Vessel Party of its obligations under these Rules.

xvi. Impala may at its option, but shall not be required, to load beyond the applicable Mississippi River Pilots Association guidelines/suggestions when weather/tide forecast indicate that loading to a deeper draft may substantially delay Vessel departure.

## 4.2. Stowage

The Vessel Party shall be solely responsible for the stowage of the Cargo. Cargo shall be stowed within the Vessel only in areas where grabs and equipment spouts can reach, subject to Vessel design capability. Dozer work shall be provided to the Vessel Party at an additional charge agreed upon by Impala and the Vessel Party prior to the Vessel coming into the Terminal. In any event, the loading sequence plan shall not exceed two pass loadings and two hold trims. Impala will allow each Vessel two draft checks which are not to exceed a period of 60 minutes each. Any Vessel exceeding the allotted time for draft checks will also be assessed the detention fee of $1,200 per hour (in whole hours).

Any Vessel which is required to shift/warp within the Terminal will be responsible for any/all expenses pertaining to shifting/warping, including, but not limited to, line handling, pilot, and tug(s), unless ordered by Impala outside the course of normal operations.

## 4.3. Suitability of Cargo

User hereby expressly acknowledges that Impala only provides transfer facilities at the Terminal. Impala reserves the right, without any responsibility for any loss, damage, or demurrage that may arise, to refuse any Cargo because in the sole discretion of Impala, such Cargo is unmerchantable or in an unfit condition for loading, unloading, transfer or handling.

## 4.4. Handling of Cargo

User hereby expressly acknowledges that varying temperatures, moisture and weight changes and spontaneous combustion constitute inherent problems associated with the handling of Cargo. Prior to loading or unloading, User's surveyor shall determine that the temperature, moisture and condition of the Cargo are satisfactory.

## 4.5. Weather Conditions

In Impala's opinion, if weather conditions threaten the safety of any moored or fleeted Vessel and/or the

structural integrity of the Terminal, Terminal operations and/or services will be suspended and any Vessel moored or fleeted at the Berth or the Buoys shall vacate the Berth or Buoys immediately when requested by Impala to do so and until such time as weather conditions permit return to the Terminal. If any Vessel does not leave the Berth or Buoys within 3 hours of being ordered to do so, all costs (including but not limited to attorneys' fees) and expenses in connection with the moving of the Vessel and mooring or fleeting of same, as the case may be, shall be for the account of and at the full risk of the Vessel and the Vessel Party. In no event shall Impala have any responsibility for any Vessel, including, but not limited to, the cost of moving a Vessel that is ordered to vacate the Terminal for any reason provided in these Rules, and the Vessel Party shall indemnify and hold Impala harmless from same. Any damage to the Terminal or other equipment shall be the responsibility of the Vessel Party and Vessel, and the Vessel Party and Vessel, jointly and severally, shall indemnify and hold Impala harmless from any such damage. Any Vessel calling at the Terminal shall be subject to the written guidelines and procedures relative to hurricanes adopted by Impala, as such guidelines and procedures may be posted and updated from time to time on the Terminal's website.

## SECTION 5. VESSEL OPERATIONS

### 5.1.    Mooring Practices

The safe berthing and securing of the Ocean Vessels is the responsibility of the Master of the Ocean Vessel, and the safe berthing and securing of the Barges is the responsibility of User. Impala has no duty to direct, control, or instruct any Ocean Vessel or Barge in its navigation and mooring, to recommend the number of assist tugs, to supply or advise of the number and/or placement of mooring lines the Vessels should employ, to recommend use of pilots, or to advise of open and obvious conditions. Any repositioning or other securing of the Ocean Vessel needed to meet Impala safety requirements will be a precondition to the Ocean Vessel being ready in all regards to load or unload.

### 5.2.    Vessel to Remain All Fast

It is the Vessel's responsibility to maintain the Vessel All Fast in the Berth or at the Buoys at all times, and to maintain lines taught at all times to prevent Vessel from moving in the Berth or at the Buoys. If the Vessel is not maintained All Fast, Impala reserves the right, in its reasonable discretion, to: (a) suspend loading or unloading; (b) require Vessel to ballast or de-ballast to a safe condition; and/or (c) order the Vessel to leave Berth or Buoy at Vessel's expense. The Vessel will be held responsible for all delay costs resulting from not maintaining the Vessel All Fast in the Berth or at the Buoys, inclusive of all standby time incurred by any Impala crane barge. All such charges will be assessed as set forth in these Rules.

### 5.3.    Berthing and Safety Equipment

Upon berthing, the Ocean Vessel shall immediately and at all times provide adequate lighting, equipment, and appropriate officers and crew aboard to permit loading or unloading, as the case may be, of Cargo at any time of the day or night, including Saturdays, Sundays and Holidays. All Ocean Vessel officers and crews shall wear life jackets, safety glasses, steel-toed boots, and hard hats while at the Terminal.

### 5.4.    Line Handling

The master and crew of every Vessel will provide assistance in handling lines and operating deck machinery. If necessary, the Vessel shall safely shift on its own lines as required by Impala during loading or unloading. An English-speaking deck officer must be available to ensure timely response to directions of any representatives of the Terminal relative to handling of lines. Terminal representatives will position lines in the

Berth and at the Buoys. Line handling by Impala for docking and undocking of Ocean Vessels in the Berth and at the Buoys, shall be assessed at the rate provided in <u>Schedule 1</u>.

### 5.5.    **Use of Tugs**

When an Ocean Vessel is entering or leaving the Terminal, Impala shall provide a–the number tugs required and requested by the Vessel Master and/or the Vessel's agent at the sole expense of and for the account of the Vessel and the Vessel Party at the rates set forth in <u>Schedule 1</u>. If the Master of the Ocean Vessel determines that weather or other conditions warrant the use of additional tugs, such additional tugs will be at the sole expense of and for the account of the Ocean Vessel and the Vessel Party, at the rates set forth in <u>Schedule 1</u>. A one hour waiting period from the call-out time is allowed. Any additional time will be invoiced in accordance with the standby rate set forth in <u>Schedule 1</u>. Charges for tug and towage services will be assessed to the relevant Vessel Party by Impala,.

### 5.6.    **Continuous Readiness**

Assignment of the Berth or Buoys under these Rules is predicated upon Ocean Vessel's continuous readiness 24 hours a day, 7 days a week to receive or unload Cargo at the Terminal's full normal rate, throughout the entire time in Berth or at the Buoys and compliance with the directions of Impala, including shifting within or between anchorage sites, the Berth or the Buoys. Any delay in loading or unloading by the Ocean Vessel or refusal to follow directions of Impala, including an order to vacate the Berth or Buoys, shall subject the Ocean Vessel and the Vessel Party to a charge of 115% of the then-current hourly dockage rate per hour (with partial hours prorated) which shall be assessed as liquidated damages regardless of any intervening circumstances of any nature.

### 5.7.    **Vessel Rotation**

Impala may alter the turn of Ocean Vessels for loading or unloading, when, in Impala's sole judgment, it is in the best interest of Terminal operations; provided, however, if Impala chooses to berth an Ocean Vessel in front of another Ocean Vessel that properly tendered NOR first (and such Ocean Vessel that first tendered NOR arrived within its Laycan and otherwise complied with the terms hereof, including, without limitation, <u>Section 3</u>), only in such instance will Impala be liable to such displaced Vessel Party for demurrage in accordance with the charter party disclosed to Impala.

### 5.8.    **Vacating the Terminal**

If an Ocean Vessel (a) is unable or refuses to load or unload, or shift within or between anchorage sites, at the Berth or the Buoys, (b) refuses or fails to vacate the Terminal when ordered to vacate at any time in Impala's sole discretion, or (c) fails to vacate the Terminal within one hour of completion loading or unloading, Impala shall be entitled to charge and recover from Ocean Vessel and the Vessel Party as liquidated damages 115% of the then-current hourly dockage rate per hour (with partial hours prorated) beginning one hour after delivery of the notice to vacate and continuing as long as the Ocean Vessel remains in the Terminal, regardless of any intervening circumstances of any nature.

### 5.10.    **Nuisance Created By Vessels**

No Vessel shall permit excessive smoke, steam, noise or cleaning of boiler tubes by blowing or other means while at the Terminal.

### 5.11.    Vessel Suitability

Impala reserves the right to refuse any Vessel considered unseaworthy due to damage, distribution of load, draft or lack of freeboard, lists or such other reason for which Impala deems the Vessel not suitable for calling upon or conducting operations at the Terminal. The Vessel Party, at all times, shall remain responsible for the seaworthy condition of its Vessel. The berthing of any Ocean Vessel or delivery of any Barge to the Terminal shall constitute a warranty by the Vessel Party to Impala that the Vessel is seaworthy and that same is capable of either being loaded with the Cargo to be loaded by Impala or to be unloaded by Impala using the equipment normally employed by Impala. In no event shall Impala be responsible for the seaworthiness, maintenance, repair or service of any Vessels coming into the Terminal or delivered to the Terminal, such responsibility being that of the Vessel Party. Notwithstanding the foregoing, should any Vessel develop any leaks, cracks or other conditions which, in the sole judgment of Impala, may result in damage to the Vessel and/or its Cargo, the Vessel Party agrees to take whatever steps are necessary to protect the Vessel and/or its Cargo.

### SECTION 6.  GOVERNING LAW; FORCE MAJEURE; LIMITATION OF LIABILITY; MISCELLANEOUS

### 6.1.    Governing Law; Jurisdiction and Venue

This Agreement shall be construed and enforced in accordance with the General Maritime Law of the United States, and to the extent they are not applicable, the laws of the State of Louisiana shall apply without regard to its conflicts of laws provisions. Each of the Parties hereto hereby submits to the exclusive jurisdiction of the United States District Court for the Eastern District of Louisiana (New Orleans Division) in the State of Louisiana, and irrevocably waives any objection which it may now or hereafter have to said venue and/or forum. Should Impala engage counsel to enforce any provision in these Rules, User and/or Vessel Party shall be liable for any and all attorney's fees and costs incurred by Impala.

### 6.2.    Force Majeure

In the event that Impala or User or any Vessel Party is rendered unable, wholly or in part, by reason of Force Majeure to carry out its obligations under these Rules, it is agreed that the obligations of such party shall be suspended to the extent of and during the continuance of any inability so caused, but for no longer period; and such cause shall, so far as reasonably possible, be remedied with all reasonable dispatch by the party or parties claiming Force Majeure. If the Force Majeure event renders Impala unable, wholly or in part, to carry out its obligations under the Rules, User may at its discretion make other arrangements for berthing, transfer or stevedoring operations until the Force Majeure event has ended. The party claiming Force Majeure shall provide written notice to the other party of such Force Majeure, and in such notice, shall give reasonably full particulars concerning the nature and anticipated duration of the Force Majeure and the actions being taken to avoid or minimize its effect, as soon as reasonably possible after the occurrence of the cause relied upon. Impala shall not be liable for demurrage or any other charges incurred by a Vessel Party or User during a Force Majeure event.

### 6.3.    Limitation of Liability

EXCEPT WITH RESPECT TO A PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER IN NO EVENT SHALL A PARTY BE LIABLE TO ANY OTHER PARTY FOR ANY INDIRECT, SPECIAL, PUNITIVE, EXEMPLARY, OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, DAMAGES FOR LOST REVENUE, LOST PROFITS OR LOST BUSINESS, OR LOSS OF MARKET VALUE, REGARDLESS OF WHETHER AS A RESULT OF THE NEGLIGENCE, STATUTORY STRICT LIABILITY, OR FAULT OF EITHER PARTY, RELATING TO THESE RULES.

## 6.4.   <u>Miscellaneous</u>

a.      Headings and sub-headings of Sections in these Rules have been included for convenience and are not deemed to be part of this Agreement and shall not be used in the interpretation or construction of these Rules.

b.      The waiver by Impala of any of the terms and conditions contained in the Rules shall be valid only if in writing and to the particular occasion and shall not be deemed to be continuing or a waiver by Impala unless specifically expressed in writing by Impala to be so, and shall not constitute a waiver or relaxation of any of the other conditions contained in these Rules.

c.      If and for so long as any provision of these Rules shall be deemed to be judged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other provision of these Rules except only so far as shall be necessary to give effect to the construction of such invalidity, and any such invalid provision shall be deemed severed from these Rules without affecting the validity of the balance of these Rules.

## SECTION 7. DEFINITIONS

"**Acceptance Notice**" has the meaning given that term in <u>Section 3.2</u>.

"**Agents**" has the meaning given that term in <u>Section 1.5</u>.

"**All Fast**" means that such Ocean Vessel is safely secured to the Berth (or the Buoys) and that the gangway is down and secured.

"**Barge(s)**" means conventional open hopper rivers barges provided by User.

"**Berth**" means the Terminal's fixed dock and wharf structure located at mile marker LMR 169.5.

"**Berth Application**" means that certain Impala Terminals Burnside LLC Berth Application, a form of which is attached hereto as <u>Schedule 2</u>, as such application is distributed by Impala, posted on its website and updated from time to time.

"**Buoy(s)**" means Terminal's midstream mooring buoy system located at mile marker LMR 169.2.

"**Cargo**" means coal and other dry bulk cargo as approved by Impala.

"**Claims**" means all claims, suits, causes of action, demands, losses, liabilities, damages, costs, expenses, fees (including, but not limited to, reasonable attorneys' fees), and court costs.

"**Customer Contract**" has the meaning given that term in <u>Section 1.1.10</u>.

"**Day**" means a consecutive 24-hour period or fraction thereof.

"**Deadweight**" means the difference between a Vessel's loaded and light displacement, consisting of the total weight of cargo, fuel, fresh water, stores, and the crew.

"**Dockage**" means the charge assessed against a Vessel for berthing at the Terminal and as set forth in

Schedule 1.

"**Estimated Time of Arrival**" or "**ETA**" means the Vessel-issued information regarding estimated arrival date and time at the specific location off the Terminal at which Vessel will customarily be required to tender NOR.

"**Force Majeure**" means any act, event, or circumstance at the Terminal or that effects the Impala's ability to provide Services at the Terminal, whether of the kind described herein or otherwise, that is not reasonably within the control, does not result from the negligence of, and would not have been avoided or overcome by any exercise of reasonable diligence by, the party claiming force majeure, and that prevents or delays in whole or in part such party's compliance with, or performance of any one or more of its obligations under these Rules, and may include without limitation the following: acts of God, acts of natural phenomena, landslides, subsidence, severe lightening, earthquakes, volcanic eruptions, fires, tornadoes, hurricanes, storms, floods and high water, washouts, tidal waves or tsunamis; acts of terrorism or war; strikes, lockouts or labor disputes; orders, rules, regulations, restrictions or laws of any governmental authority having or asserting jurisdiction; expropriation, requisition, confiscation, or nationalization of the terminal; epidemics or quarantine; inability to procure material, equipment or necessary labor for the Terminal; inability to obtain, or suspension, termination, adverse modification, interruption or inability to renew any servitude, right of way permit, license, lease, consent, authorization or approval of any governmental body having or asserting jurisdiction; or breakdown or destruction of the Terminal docks, pipelines, machinery, or equipment; electrical failure at the Terminal, closures or restrictions imposed on the port or public channels (including fog restrictions) by the U.S. Coast Guard or other governmental authority having or asserting jurisdiction over the Terminal and/or operations on the LMR.

"**Holidays**" shall consist of the following days and any other days that may be designated as holidays by the United States, the State of Louisiana, Ascension Parish or any other governmental authority having lawful jurisdiction, or in the labor agreements between Impala and its employees: New Year's Day, Martin Luther King Jr. Day, President's Day, Mardi Gras Day, Good Friday, Easter, Memorial Day, Independence Day, Labor Day, Columbus Day, All Saint's Day, Veteran's Day, Thanksgiving Day, Christmas Eve, Christmas Day and New Year's Eve. Should any of the above holidays mentioned, or not mentioned, fall on Saturday, the preceding Friday shall be observed as a holiday and any holiday that falls on a Sunday shall be observed on the following Monday. No work days are Labor Day, Christmas Day (6:40 P.M. December 24th through 6:40 A.M. December 26th) and New Year's Day (6:40 P.M. December 31st through 6:40 A.M. January 2nd). Abbreviated work hours may be observed on any holiday that Impala shall designate.

"**Impala**" means Impala Terminals Burnside LLC.

"**Impala Group**" has the meaning given that term in Section 1.3.2.

"**Laycan**" means that certain period within the Layday Period and the earliest date at which loading (Laytime) can commence and the latest date upon which the Vessel can arrive at its appointed loading place without being at risk of being canceled.

"**Layday Period**" means the agreed-upon period during which Vessel Party will make the Vessel available for loading.

"**Laytime**" means the period of time during which Impala must load the Vessel at the loading rates set forth herein subject to all other terms herein.

"**Notice of Readiness**" or "**NOR**" means the document to be tendered by the Vessel master or the Vessel agent to the Terminal indicating readiness for proceeding to the Terminal (according to the terms hereof, including,

without limitation, Section 3 .4) following arrival of such Vessel at the specific location off the Terminal at which Vessel will be customarily required to wait for pilots or prior to proceeding to the Terminal.

"**Ocean Vessel**" means any single-deck, ocean-going Vessel, other than a Barge, that utilizes the services and facilities of the Terminal for the loading, unloading, handling or transfer of Cargo.

"**Rules**" means these Burnside Terminal Rules and Regulations, as amended from time to time.

"**Terminal**" means the bulk loading terminal known as the "Burnside Terminal" located at 4258 Hwy 44, Darrow, Louisiana, 70725 owned by Impala, which includes the Berth and the Buoys with the characteristics listed in Section 2 and is capable of safely accommodating Vessels for loading or unloading.

"**User(s)**" shall include the Vessel Party, any person or entity with whom Impala has a separate contract for use of the Terminal, and all individuals or business entities, including all Ocean Vessels, Barges, trucks, railroad cars or other means of conveyance and/or equipment used by Vessel Party and said individuals or business entities, which utilize the services and/or facilities of the Terminal.

"**Vessel**" includes within its meaning every description of water craft or other artificial contrivance whether self-propelled or non-self-propelled, capable of being loaded or unloaded at the Terminal and used as a means of transportation on water and shall include in its meaning the owner thereof and the agent acting on its behalf. The term "Vessel" or "Vessels" shall include any Barge, ocean-going barge, or Ocean Vessel.

"**Vessel Party**" means any party or parties owning, operating, nominating or contracting with a Vessel, including, but not limited to, her agent(s), owner(s), operator(s), charterer(s), and any of her or their respective employees and contractors.

"**Visitor List**" has the meaning given that term in Section 3.4.

"**Visitor(s)**" means any individual or entity listed in the Visitor List and any other individual or entity that seeks access to the Terminal or any Vessel berthed there, including, but not limited to, any surveyor.

"**Weather Working Day**" means any period of 24 consecutive hours during which weather permits ship loading operations, as determined in Impala's sole but reasonable discretion.

### Schedule 1. TERMINAL SERVICES AND RATES

Current rates are set forth on Appendix I hereto. Such rates are subject to change at the discretion of Impala. Lack of notice by Impala or lack of acknowledgment by the Vessel will not relieve the User, Vessel Party and/or Vessel of its obligation to pay the changed fees:

### A.    DOCKAGE (at the Berth or the Buoys)

Dockage shall be assessed against each Vessel (excluding Barges) per Gross Registered Ton (GRT) per 24 hour period, not prorated. The dockage day shall commence upon the Vessel's first line at the Berth or the Buoys and shall be considered complete at the time the last line is removed from the Berth or the Buoys. The GRT shall be based on the Vessel's highest GRT as per Lloyd's Register of Shipping. The Terminal's fuel surcharge shall not apply towards dockage charges.

### B.    TOWAGE SERVICES

Towage shall be assessed to each Vessel per tug for Vessels mooring or unmooring at the Berth, per tug for Vessels mooring or unmooring at the Buoys and an additional per-hour charge per tug for Vessels requiring warping assistance alongside the Berth. Hold in tugs (if required by the Vessel) shall be assessed a per-hour rate per tug, and Impala will assess a per-hour rate per tug for any tug delays or tug standby time which may be incurred. While these towage service rates do include customary GRT charges, they do not include and are subject to Terminal's fuel surcharge. Vessel agent shall make arrangements for timely tug assistance directly with a tug service provider.

### C.    LINE HANDLING SERVICES

Line handling services shall be assessed to each Vessel for Vessels mooring to the Berth and a separate charge for Vessels mooring to the Buoys. The rate for mooring to the Berth is not subject to a fuel surcharge unless a crew boat is needed to secure the Vessel at the Berth. The rate for mooring to the Buoys is subject to Terminal's fuel surcharge. Line handling charges include both mooring and unmooring of each Vessel but do not include any additional line services which may be required by the Vessel, such as line assistance for warping, which can be discussed on a case by case basis. There shall be a re-tie cost in the Berth or at the Buoys should the Vessel required re-tying.

### D.    LAUNCH SERVICES

Impala will provide launch access to/from the Vessels in conjunction with the calculation of dockage days. Terminal's launch service per-day fee is subject to Terminal's fuel surcharge. Impala reserves the right to refuse service to anyone wishing to utilize Terminal's launch service who in Impala's opinion is a risk to safety or is visiting for a reason other than official ship's business. Impala will not permit any stores, pallets, cylinders, lubes, etc. to be delivered to any Vessel via its launch service.

### E.    SECURITY FEES

Impala will assess to, and collect a security fee per day for each Vessel moored at the Berth and to each Vessel moored at the Buoys. The day shall be determined as per the dockage and launch calculations. It should be noted that this security fee does not constitute providing security for the Vessel if so ordered by a U.S. government agency. In such a case, the vessel agent shall arrange security guards on behalf of the Vessel and at the Vessel's expense. The security fee shall be in addition to all other fees and charges due hereunder.

## F.   ACCESS FEE

Impala will assess a terminal access fee per-person each way for any Visitor who wishes to transit through Terminal's terminal boundaries to or from the Vessel. Impala reserves the right to refuse passage of anyone whom Impala deems is a risk to safety or is visiting for a reason other than official ship's business. Proper credentials must be presented to Terminal's security officer and it is recommended that advance arrangements be made for any such passage in order to avoid unnecessary delays. Vessel agents and marine surveyors who are performing official ship's business for the present voyage shall be exempt from this fee and access through Terminal will only be granted to agents and surveyors who are in possession of a valid Transportation Worker Identification Card (TWIC).

## G.   FUEL SURCHARGE

Impala will assess a fuel surcharge on towage, line handling and launch services. Terminal's fuel surcharge is 1% percent for each 3¢ per gallon above $2.00 at the time of first service provided to the Vessel. Terminal's fuel surcharge will not apply towards dockage charges. The following is an example of the fuel surcharge:

Fuel charge from tug subcontractor: $3.50

Surcharge: $3.50 - $2.00 = $1.50

$1.50/$0.03 = 50

50 X 0.01 = a 50% surcharge added to the towage, line handling, and launch charges set forth on Appendix 1

## H.   DOCK DETENTION PENALTY

Impala shall been titled to charge and recover from Ocean Vessel and the Vessel Party as liquidated damages 115% of the then-current hourly dockage rate per hour (with partial hours prorated) beginning one hour after delivery of the notice to vacate and continuing as long as the Ocean Vessel remains in the Terminal, regardless of any intervening circumstances of any nature.

Impala shall not provide any gangways. Impala reserves the right to deny use of Terminal and/or to provide above mentioned services solely at Terminal Operator's discretion, including during changes in MARSEC level, river conditions or severe weather events. All fees must be paid in advance to Terminal based on the estimated fees prior to Vessel's berthing unless otherwise mutually agreed between Impala and the Vessel.

## I.   WHARFAGE RATES

Wharfage will be charged for Vessels loading/unloading/transshipping Cargo directly to or from other Vessels/barges at standard wharfage rates. Wharfage shall be negotiated between Impala and the Vessel prior to any loading/unloading/transshipping taking place. No such loading/unloading/transshipping shall occur without the prior approval of Impala and, if necessary, the U.S. Coast Guard.

## J.   LAYBERTH

A Vessel berthed at Terminal for non-loading purposes (i.e., lay berth) shall be charged at the same rates as those berthed for loading/unloading purposes.

## K.    BARGE COVER HANDLING

Any Barges requiring assistance by Impala in handling river barge covers shall be charged for the service at a rate of $1,250 per Barge.

## L.    WATER

Water flow and access to water mains is limited.  Arrangements for water shall be made with Impala in advance of berthing the Vessel and such arrangements will be made for the convenience of the Vessel only.  Water, when available, will be furnished at a rate of $3,500 per water barge.  Prior approval and coordination by Impala shall be required for water delivered by water barge.  Impala shall not provide potable water to Vessels.

Appendix I: Rate Schedule

| Service | Type | Berth | Buoy |
|---|---|---|---|
| Dockage | | 0.46 Per GRT Per 24 Hour Period subject to minimum charge of $7,500 per day | 0.46 Per GRT Per 24 Hour Period subject to minimum charge of $7,500 per day |
| | Vacate Berth/Detention | 115% of then-current hourly dockage | 115% of then-current hourly dockage |
| Towage | Docking/Undocking | $3500.00 Per Tug | $3950.00 Per Tug |
| | Warping Assistance | $975.00 Per Hour | $975.00 Per Hour |
| | Hold In Tugs | $975.00 Per Hour | $975.00 Per Hour |
| | Tug Delays / Standby | $975.00 Per Hour | $975.00 Per Hour |
| | Tractor Tugs | 1.5 Times the applicable rate above | 1.5 times the applicable rate above |
| Line Handling | Docking/Undocking | $3500.00 Includes In And Out | $4000.00 Includes In And Out |
| | Re-Tie Cost | $1700.00 | $2000.00 |
| Launch Service | | $1200.00 Per Day | $1200.00 Per Day |
| Security Fees | | $1250.00 Per Day | $950.00 Per Day |
| | Fuel Surcharge | One (1%) Percent For Each 3¢ Per Gal. | One (1%) Percent For Each 3¢ Per Gal. |
| | Fuel Base Cost | $2.00 Per Gal. | $2.00 Per Gal. |
| | Bunkers | Permitted with prior notice/arrangement | Permitted with prior notice/arrangement |
| Barges | Cover Handling | $1,250 per occurrence not including shifting fees | N/A |
| | Barge Pumping | $750 per occurrence | N/A |
| Mid Stream Crane | Stand by (Delay) | $1,200 per hour | N/A |

34

## Schedule 2.  BERTH APPLICATION FORM

### IMPALA TERMINALS BURNSIDE LLC
### BERTH APPLICATION AND ACCEPTANCE OF FINANCIAL RESPONSIBILITY

**Email:** BurnsideShips@ImpalaTerminals.com
**FAX:** (225) 289-5225
**TERMINAL OFFICE PHONE:** (225) 289 - 5211

THIS APPLICATION MUST BE SUBMITTED AS FAR IN ADVANCE OF THE DATE OF BERTHING AS POSSIBLE.
AGENT WILL PROMPTLY NOTIFY THE APPROPRIATE VESSEL SCHEDULING OFFICE OF ANY CHANGES IN
THE INFORMATION SUPPLIED BELOW.  AGENTS ARE ADVISED THAT BLANK ENTRIES ON THIS FORM
MAY RESULT IN REJECTION OF THIS BERTH APPLICATION BY IMPALA.  IMPALA WILL NOTIFY AGENT OF
UNACCEPTABLE APPLICATIONS.

| VESSEL PARTICULARS | | | | | | |
|---|---|---|---|---|---|---|
| VESSEL NAME / VOYAGE NUMBER | FLAG | G.R.T | L.O.A | BEAM | MAX (FT/IN) | DRAFT |
| | | | | | | |
| VESSEL OWNER/OPERATOR/CHARTERER/LINE | P & I CLUB / LOCAL CONTACT | | | | LLOYDS NO. | |
| | | | | | | |
| EST. BOARDING DATE/TIME | EST. DEPARTURE DATE/TIME | | BERTH REQUESTED/SHIFTS | | | |
| | | | | | | |
| INBOUND CARGO AND ESTIMATED METRIC | | | | | | |
| OUTBOUND CARGO AND ESTIMATED METRIC TONS | | | | | | |
| APPOINTED STEVEDORE | | LAYBERTH | LIGHTER | FRESH WATER | | |

NOTE: Agents are advised that safety guidelines are set by the local pilots associations in regard to vessel length, draft, beam air
draft, and other factors that may affect the transit of the vessel into the Terminal.  Please consult with the local pilot associations to
determine if any restrictions apply.

Any ballast removed from the vessel after loading commences must be coordinated with the management at the
Burnside Terminal.  It is understood and agreed that ship officials will acknowledge cargo receipt at the Burnside
Terminal by signing and releasing a clean Mates' Receipt immediately upon completion of loading.

THE UNDERSIGNED COMPANY, AGENTS FOR THE ABOVE-NAMED VESSEL, IN CONSIDERATION FOR APPROVAL
OF THE BERTH APPLICATION, AGREES TO BE BOUND BY ALL RULES, REGULATIONS, TERMS, CONDITIONS AND
CHARGES AS PUBLISHED BY IMPALA, INCLUDING ACCEPTANCE OF FINANCIAL RESPONSIBILITY THEREFOR.

| DATE OF APPLICATION | APPLICANT COMPANY NAME AND BILLING ADDRESS | | PRINT NAME AND JOB TITLE | |
|---|---|---|---|---|
| | | | Name | |
| | | | Title | |
| | | | Signature | |
| IMPALA USE ONLY | APPROVED Subject to Availability | | CREDIT OK | JOB NUMBER ASSIGNED |

1. **Shipment:** Product shall be delivered FOB spout-trimmed in vessel's hold at Trombetas Port, Brazil in accordance with INCOTERMS 2010. The Buyer will be responsible for contracting and paying for the freight from Trombetas Port to the final destination.

2. **Loading Terms:** Per the standard loading terms in effect at the time of shipment at Trombetas Port, Brazil. The current loading terms are attached hereto as Annex B.

3. **Discharge Port:** Intended destination is Burnside, US. Destination to any other port in Buyer's absolute option, except to a port in these countries or territories subject to comprehensive international economic sanctions, in accordance with clause 13 in Annex A. Alcoa shall be notified if Almatis wishes to change the destination of any cargo.

**Demurrage/Dispatch:** Demurrage and Dispatch shall be charged or earned at a rate of US$0.15 (fifteen cents of dollar) per metric ton per day/half dispatch.

10. **Terms of Shipment.** Terms of Shipment shall be as set forth in the Contract, and shall be interpreted in accordance with INCOTERMS 2010, or the latest edition of INCOTERMS published by the International Chamber of Commerce.

11. **Loading; Transport.** Product shall be loaded in accordance with Standard Port of Loading Terms and Conditions, unless otherwise noted in the Contract. Standard Port of Loading Terms and Conditions may be amended from time to time by Seller. Unless otherwise agreed, Buyer will arrange, at its expense, for the vessel necessary to transport the Product. Buyer is responsible to either pay or guarantee contracted vessel owners to pay for port charges/expenses and vessel disbursements, as well as ships husbanding matters.

12. **Weighing.** The weight of each cargo shall be the Bill of Lading weight, as determined by draft survey carried out by a qualified and competent marine surveyor appointed by the Seller using "Ship's Displacement" method at the time of the vessel's loading. In the absence of manifest error, the draft survey report shall be conclusive evidence of the weight each cargo of Product. Each party, at its own expense, may have a representative present at each determination of weight.

13. **Trade Regulation.** Export of any Product sold hereunder must be in accordance with United States and Australian export laws and regulations, as well any applicable export laws and regulations of the country of production if other than the United States or Australia. Shipment contrary to such law or regulation is strictly prohibited. Further, the Buyer shall comply with all laws and regulations applicable to the use, sale, distribution, transfer, export, or re-export, directly or indirectly, of any Product, including the laws of the United States ("U.S.") and any other country in which the Buyer or the Seller undertakes any of the foregoing. The Buyer will not transfer, export, or re-export, directly or indirectly, any Product to U.S. embargoed countries, or any nationals thereof, or to any other country subject to restriction under applicable laws and regulations, (including but not limited to those indicated by the U.S. Treasury Department and the Buyer hereby warrants that it is not located in, under the control of, or a national or resident of any such country). The Buyer will not transfer, export, or re-export, directly or indirectly any Product to any party listed by any applicable government or law as prohibited from receiving such products, and the Buyer hereby represents that it is not on, or under control of any person or entity which is on any such list. Without limiting any other provision of this clause 13, the Buyer agrees that it will not, directly or indirectly, sell, trade, transfer ship or divert the bauxite to Cuba, The Crimea Region Of Ukraine, Iran, North Korea, Sudan, or Syria. For other destinations, if Seller has reason to suspect or believe Product will be diverted to a sanctioned person or entity in violation of this clause, Buyer must notify Seller and demonstrate to Seller's satisfaction that such transaction will not breach applicable export laws and regulations.

14. **Force Majeure.**
    (a) **Suspension of Performance.** If either the Buyer or the Seller is unable to fulfil its obligations under the Contract (the "Affected Party"), as a result of any Force Majeure Event, despite all reasonable efforts on the part of the Affected Party to do so, and a Force Majeure Notice is given in respect of such Force Majeure Event, then performance of the Affected Party's obligations under the Contract shall be suspended while and to the extent only that the Affected Party is unable to fulfil such obligations due to the Force Majeure Event. If a Force Majeure Event only affects the performance of some of the Affected Party's obligations under the Contract, then this

36

section shall only apply to those obligations and the Affected Party shall remain liable to fulfil the balance of its obligations, and the other party shall remain liable to fulfil only its counter-obligations, under the Contract.

(b) **Resumption of Performance.** The Affected Party shall exercise reasonable diligence to eliminate or remedy the effects of the Force Majeure Event, and shall give written notice to the other party as soon as practicable after the Force Majeure Event has ceased to affect the performance of the Affected Party's obligations in whole or part, as the case may be ("Cessation Notice ").

(c) **Force Majeure Defined.** For the purposes of the Contract "Force Majeure Event" means any industrial or labor dispute or action whatsoever, or action taken to deal with the same, fire, explosion, flood, war, revolution, civil unrest, blockage, embargo, act of God, ban on imports or exports, intervention, act or prohibition by any government, state, port, transportation, local or other authority or agency or body of persons or person having executive power or any other cause whatsoever whether or not of any nature of character mentioned above which is beyond the control of the Affected Party and which affects the performance by the Affected Party of the whole or part of its obligations under the Contract.

Provided, that nothing in this section shall require either Party to settle any industrial or labor dispute or action once started or preclude a Party from taking any action, in its discretion, to deal with an industrial or labor dispute or action.

(d) **Reduced Deliveries.** If a Force Majeure Event wholly or partially affects the Seller fulfilling its obligations to its other customers (including its Affiliates) to whom the Seller is obligated to deliver Product, then Seller may decide to reduce its deliveries of Product to the Buyer under the Contract so that the available production shall be fairly divided in a manner which reasonably takes into account the circumstances of all its customers. In the event of a Force Majeure Event affecting the Seller, the Buyer may elect to either: (i) extend the term of the Contract to the extent that the Seller has invoked this provision; or (ii) purchase from other suppliers quantities of the Product which the Seller is or expects to be unable to deliver, in which case the Buyer shall give the Seller written notice of such purchases, they shall be deducted from the Quantity Seller is otherwise obligated to deliver under the Contract, and the Seller shall not be liable to the Buyer for any cost, expense or loss whatsoever of the Buyer arising out of any such purchase the Buyer makes from other suppliers. In the event of a Force Majeure Event affecting the Buyer, the Seller may elect to either: (i) extend the term of the contract to the extent that the Buyer has invoked this provision; or (ii) sell to other customers quantities of the Product which the Buyer is or expects to be unable to accept, in which case the Seller shall give the Buyer written notice of such sales, they shall be deducted from the contract quantity the Buyer is otherwise obligated to receive under the Contract, and the Buyer shall not be liable to the Seller for any cost, expense or loss arising out of any such sales that the Seller makes to other customers.

(e) **Force Majeure Notice.** Upon the occurrence of a Force Majeure Event the Affected Party shall if it wishes to rely upon such event hereunder declare the same by giving written notice ("Force Majeure Notice") by facsimile to the other Party within ten (10) days after the first occurrence of (or its acquiring of knowledge of) the Force Majeure Event specifying:

(i) reasonable particulars of the Force Majeure Event; and

(ii) so far as known, the probable time, and extent to which the Affected Party will be unable to fulfil its obligations under the Contract.

(iii)

**Termination Due to Force Majeure.** If any Force Majeure declared pursuant to this section persists for a continuous period in excess of 6 (six) months from the date of the Force Majeure Notice, which affects performance of the whole or a substantial part of the Affected Party's obligations under the Contract then either Party shall be entitled to give a 30 day written notice ("Force Majeure Termination Notice") to the other Party terminating the Contract on the date specified in the Force Majeure Termination Notice, which date shall not be prior to the expiry of such notice, provided that no Cessation Notice shall have been given.

# ANNEX B
## LOADING CONDITIONS AT PORTO TROMBETAS, BRAZIL

**Porto Trombetas Terminal General Information:**

- Port: Porto Trombetas

- Geographic Location: Latitude 01º 27' 36" S, Longitude 56º 22' 47"W

## 1. Vessel Nomination

At least fifteen (15) days prior to the first day of agreed ten (10) laydays, Buyer shall nominate the performing vessel or sub, giving its full characteristics.

Vessel must conform to the following specifications and loadport limitations:

- Maximum permissible length of vessel: 240 m
- Maximum permissible beam of vessel: 40 m
- Maximum permissible draft is 11,58m (38') - may be reduced during the dry season (October to December)
- Air draft permissible is minimum of 14m and maximum of 21m, depending on river level
- Minimum hatch opening: 11.6m x 12.60m
- Maximum age: 17 years
- Maximum DWT: 100,000

All vessels nominated by Buyer shall be bulk carrier type, having bridge and engine aft, without tween decks and without centre line bulkheads, and shall be suitable to berth and load at the loading facilities on Seller's Port and shall be classed 100A1 with Lloyds Register of Shipping or equivalent class established by another recognized classification society.

Seller guarantees that the loading facilities and berth from which bauxite shall be shipped under this Agreement are safe berths and will accommodate vessels, always afloat, with the specifications acceptable to Sellers Port.

## 2. Arrival Notices

Master of vessel is to advise of the expected date and hour of arrival of his vessel at the pilot station at the port of loading 72, 48, 24 and 12 hours prior to vessel's expected time of arrival.

Vessel shall be accepted at the loading facilities at Loadport provided she is in all respects ready to load with all holds clean.

## 3. Notice of Readiness

When the vessel is in all aspects ready to load, Notice of Readiness to load shall be given to Seller at Port Trombetas in and out of office hours, Saturdays, Sundays and holidays included if lawful to work on such days, whether in berth or not, whether in port or not.

## 4. Laytime

Laytime shall commence twelve (12) hours after Notice of Readiness acceptance, unless loading sooner commenced.

Navigation/shifting time does not count as laytime used.

Notice of Readiness is accepted, first of all, at the berth in Trombetas; if the berth is already occupied, the Notice of Readiness is accepted at the mooring buoy (there are 3); if the mooring buoys are occupied, the Notice of Readiness is accepted at the Trombetas mouth or, by extension, in any point of the Amazonas river including Fazendinha.

Laytime ends at the completion of loading.

In case of congestions at Trombetas Port, the 2nd, 3rd, 4th ships in the line is allowed to stay part of the waiting time in Fazendinha, under the procedure described below:

1. If the vessel arrives in Fazendinha 40 or more hours before the beginning of the laydays period, Notice of Readiness will be accepted at the beginning of the laydays period or at the Free Pratique granted, the later to happen.
2. If the vessel arrives in Fazendinha 40 or less hours before the end of the laydays period, Notice of Readiness will be accepted only in Trombetas at the start of loading operations. The same rule is applied for those ships arriving after the laydays period.

3. If none of the above situations happen, the vessel designated to wait in Fazendinha will be accepted there at the Free Pratique Granted.

## 5. Preparation of Vessel

Buyer at its sole risk and expense shall prepare the respective vessels for receiving and loading cargo prior to arriving at Seller's loading berth. Seller shall not be liable for any contamination due to unclean vessels. All shifting of the vessel to the loading berth, in the loading berth and from the loading berth shall be performed by Buyer expeditiously and at the sole risk and expense of Buyer. The vessel shall permit the use of ship's winches and other appropriate ship's gear actually on board and shall provide sufficient power for same without cost to Seller during the loading period.

## 6. Loading Conditions / Loading Rate

Each vessel shall be loaded at the standard rate of 28,000 metric tons per weather working day of 24 consecutive hours, Saturdays, Sundays and holidays included.

## 7. Demurrage / Dispatch

Demurrage and Dispatch shall be charged or earned at a rate of US$0.15 (fifteen cents of dollar) per metric ton per day/half dispatch.

## 8. General Instructions

Trombetas Terminal is an environmental area reserve. Therefore, no salt-water un-ballast will be allowed at this area. Buyer shall advise master or ship-owners that water ballast cannot have a salinity higher than 0.5% nor a water density greater than 996Kg/L to 1.000Kg/L.

Unless otherwise instructed by the Seller, the Buyer shall instruct master or ship-owners that Vessels must be presented for berthing with minimum ballast compatible with its respective seaworthiness and air draft restrictions, in order to avoid stoppages during loading operation.

It is forbidden any type of oil transfer, disposal or any operation that can cause risk of contamination.

**SANCTIONS CLAUSE for Voyage Charters:**

(a)      Charterers and Owners warrant that each will comply with (i) any applicable sanction or prohibition imposed by any State, Supranational or International Governmental Organization and (ii) any sanction or prohibition imposed by the UN and its Security Council, EU (including its member states), the UK and/or U.S., in each case as if such sanction or prohibition were binding on such party (to the extent compliance would not violate the laws and regulations of the U.S.) (collectively, "Sanctions").

(b)      The Owners shall not be required to commence, proceed or continue loading cargo for or on any voyage or to sign Bills of Lading for any port or place or cargo interest, which will expose the Vessel, Owners, managers, crew, the Vessel's insurers, or their re-insurers, to any Sanctions.

(c)      If Sub-clause (b) applies, the Owners may request alternative orders and/or cargo, and if acceptable alternative orders and/or cargo are not received within 48 hours, the Owners may discharge any cargo already loaded at any port of their choice (including the port of loading).  Time lost to be counted as demurrage pending completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and Charterers to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo. If in compliance with this Sub-clause (c) anything is done or not done, such shall not be deemed a deviation.

(d)      The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the owners of the cargo and/or the holders of Bills of Lading and/or sub-charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Sub-clause (c).

(e)      The Charterers shall procure that this Clause shall be incorporated into all sub-charters pursuant to this Charter Party.

(f)      The Charterers shall promptly provide information as reasonably necessary for Owners to determine compliance with this Clause.

**EXHIBIT B**

1

**NORDIC**
BULK CARRIERS A/S
a Pangaea Logistics Solutions company

Lalumina LLC

| | |
|---|---|
| Invoice Date | 26Mar2020 |
| Invoice No. | 8313 |
| Our Reference | F00636 |
| | |
| Payment No. | 4 |

## FREIGHT INVOICE

| | |
|---|---|
| *C/P Date:* | *6Dec2019* |
| *Vessel:* | *MEDI YOKOHAMA* |
| *Charterer:* | *Lalumina LLC* |
| *Fixture Ref.:* | *KAMSAR/BURNSIDE 55010 DEC13-19* |

*Voyage no.:*   1

**Note all values are in USD**

Load: BAUXITE at Kamsar, 51,205MT as per BL
Discharge: at Burnside
Total BL Quantity : 51,205MT
CP Minimum    : 55,000.000MT 10% MOLOO

| | |
|---|---|
| Balance of Freight : 51,205.000MT @ 14.75 USD/MT = Total, less previously invoiced 717,510.06 USD | 37,763.69 |
| Demurrage on discharging BAUXITE at Burnside | 43,168.40 |
| Despatch on loading BAUXITE at Kamsar | -7,204.86 |
| **TOTAL** | **73,727.23** |
| | E. & O. E. |

REMITTANCE DATE : 2Feb2020

*Please remit according to the details below quoting our reference and invoice no.*

Bank Name: Nordea A/S
Beneficiary: Nordic Bulk Carriers A/S
IBAN/Account Number: ▮▮▮▮▮▮▮▮3607
SWIFT/BIC/ABA: ▮▮▮▮DKKK

# EXHIBIT C



# Bauxite and alumina: Almatis sells shares in US Burnside subsidiary

Posted 15th July 2019 in Industry news.



On 27 June, Almatis reported the sale of 100% of its shares in Almatis Burnside to Arthur Metals. Almatis Burnside is an alumina manufacturer based in Louisiana, USA and will continue to supply Almatis, along with other customers, with premium-grade alumina. Almatis expects little change over the coming months in the relations of the two companies. As well as supply to Almatis, the Burnside refinery supplies products directly to the specialty alumina and, sometimes, hydrate markets. The company is expected to change its name in due course following the acquisition.

## Roskill View

Almatis is a major producer of alumina products for use in the key markets of refractories, ceramics and polishing. It originally acquired the Burnside refinery facilities from Ormet Corporation in December 2013. At the time, the acquisition was seen as an important backwards integration for Almatis, providing the company with feedstock for its downstream alumina products manufacturing business. The Burnside refinery had 500ktpy of capacity at the time of this acquisition. Falling prices for bauxite and alumina through 2019, however, have made purchases of raw material from the market more attractive than having a captive supply.

The 10th edition of Roskill's Non-metallurgical Bauxite & Alumina: Outlook to 2029 report, with detailed analysis of the market, will be published in August 2019. Click here to download the brochure and sample pages or to access further information.



## RELATED PRODUCTS

Metallurgical Bauxite & Alumina

## ROSKILL

**Head office**
54 Russell Road, Wimbledon, London, SW19 1QL, United Kingdom

**Regional offices**
Canada, China, Brazil, Germany, Japan, New Zealand, Slovakia, South Africa, Spain

+44 20 8417 0087
Contact Us

.cls-   .cls-
1{fill:#333}i#333}icon-
twitterlinkedin

**ABOUT US**

Contact

About

The Team

The Board

Careers

Consulting

Costs & Data Services

News

Subscribe to our Weekly Round-up

**MARKET REPORTS**

Steel Alloys

EV Raw Materials

Copper & Technology Metals

Industrial Minerals & Chemicals

All Market Reports

## EVENTS

Technology Metals 2021

On the road… Santiago 2021

Salt 2020

On the Road… London 2020

All events

Terms of Use

Privacy Notice

Event Terms & Conditions

Subscription Terms

Copyright Notice

Website by designbooth

**EXHIBIT D**

# Alumina manufacturer in Ascension Parish laying off 300 workers in May

BY KRISTEN MOSBRUCKER | STAFF WRITER    APR 3, 2020 - 11:15 AM    1 min to read

1 of 2



Photo provided by IMPALA TERMINALS BURNSIDE -- After three years and $300 million in new equipment and refurbishment, In first shipment of petroleum coke at its Burnside facility over the July 4 weekend. Impala Terminals, a subsidiary of Netherlands-based the site from Ormet.

*Supporting local journalism has never been more important. Your subscription provides us with the resources to produce the news and in-depth coverage the community needs. Subscribe today for only $2.32/week.*




Kristen Mosbrucker

Specialty alumina manufacturer LAlumina LLC expects is laying off 302 workers at its plant in Ascension Parish over a two-week period at the end of May for an indefinite period of time.

The company, formerly known as Almatis Burnside, filed a notice of the layoff with the Louisiana Workforce Commission in March.

The plant has enough bauxite, the raw material used to make alumina products such as aluminum, to last 55 to 65 days. Then, a full shutdown will occur with layoffs taking place between May 24 and June 7, according to a letter from management. Only a skeleton crew is expected to remain on-site. It attributed the layoff to a slump in alumina prices caused by the coronavirus pandemic that has shut down businesses across the world.

LAlumina's largest customer is also its former owner, Almatis, which sold the plant in mid-2019.

The company previously sought to cancel several economic development incentive agreements with the state in December, citing that it could not meet requirements of the agreements.

However, the company still has a Quality Jobs program incentive with the state that could be affected by the layoffs.

The company did not respond to repeated requests for comments.

**Editor's note:** This story was corrected at 6:30 p.m. April 3, 2020, to say the layoff is for an indefinite period of time.

**Louisiana lost 4,500 jobs in past year before recent unemployment spike amid coronavirus outbreak**

Louisiana's nonfarm employment declined by 4,500 jobs over the 12 months through February, a 0.3% drop, led by job losses in construction and ...

**More than 72,000 people filed for unemployment in Louisiana last week**

The Louisiana Workforce Commission said 72,438 people filed for unemployment last week, following Gov. John Bel Edwards' order that shut down ...

**Baton Rouge Breaking News**

Stay in the know about Baton Rouge's biggest news headlines. **Sign up today for our newsletter!**

Enter email address

Sign up                                          **Manage Lists**

**EMAIL KRISTEN MOSBRUCKER AT KMOSBRUCKER@THEADVOCATE.COM.**

Alumina manufacturer in Ascension Parish laying off 300 | Business | theadvocate.com

## You May Like

Sponsored Links by Taboola







**Top US Doctor: Sugar is not the problem (This Is)**

Gundry MD Metabolic Advanced Supplements

**How To Empty Your Bowels Every Morning - Top Surgeon Explains How**

Gundry MD Bio Complete 3 Supplement

**Don't Do It Yourself - Hire a Handyman from New York for Your Home...**

HomeAdvisor

---

### MORE FROM THE ADVOCATE

- Drew Brees hypes free meals for coronavirus-furloughed hospitality workers in Baton Rouge
- Letters: Donald Trump has been pushed to the background
- Takeout in Baton Rouge: Kick off the weekend with Spanish fare, Louisiana favorites and chicken salad
- Ex-LSU two-sport star Orlando McDaniel, ex-Tiger sprinter Pearson Jordan have died of novel coronavius
- These house-hygiene tips can help keep the coronavirus from coming home

### MORE FROM OUR PARTNERS

- How to Pay Off $10,000 Fast (NerdWallet)
- Neuropathy? Do This Immediately (Watch) (healthbenefits.vip)
- How To Properly Empty Your Bowels Every Morning - Top Surgeon Explains How (gutcleanseprotocol.com)
- Prime Members Are Using This Hack To Avoid Amazon's Price Hike (Wikibuy)
- Surgeon: "Doing This Every Morning Can Snap Back Sagging Skin (No Creams Needed)" (Beverly Hills MD)

Recommended by Outbrain

## View comments

# FOLLOW US

Alumina manufacturer in Ascension Parish laying off 500 workers | Business | theadvocate.com

  

## You May Like

Sponsored Links by Taboola



### One Simple Trick To Fix Fungus

Fungus Eliminator



### Soak Your Dark Spots With This One Thing (Trending Morning...

Gundry MD



### If You Like to Play, this City-Building Game is Addictive. No Install.

Forge of Empires - Free Online Game

| SECTIONS | SERVICES | OUR SITES | |
|---|---|---|---|
| • News | • Classifieds | • Obituaries | News Tips: newstips@theadvocate.com |
| • Opinion | • Search | • Jobs | Other questions: |
| • Sports | • Subscribe | • Celebrations | subscriberservices@theadvocate.com |
| • Entertainment/Life | • Digital Advertising | • Shop | Need help? |
| | • Submission Forms | • NIE | • Report a delivery issue |
| | • Help/Contact Us | • Classifieds | • Create a temporary stop |
| | • RSS Feeds | • Homes | • Sign up for recurring payments |
| | • Media Kit | • Archives | • Pay your bill |
| | • eEdition | • Store | • Update your billing info |
| | • Careers | • Promote your event | |
| | • Teacher's Link | | |
| | • Ink Settings | | |

© Copyright 2020 The Advocate, 10705 Rieger Rd, Baton Rouge, LA | Terms of Use | Privacy Policy
Powered by BLOX Content Management System from TownNews.com.